**Larry GEORGE, Plaintiff,**

v.

**Judy SMITH, Ruth Tritt, Marty Schroeder, Officer Vilski, Tim Pierce, Nurse Carivou, Rebecca Blodgett, Tom Edwards, Mary Hopfensperger and Dr. Chan, Defendants.**

No. 05–C–0403–C.

United States District Court,
W.D. Wisconsin.

Dec. 22, 2006.

Jody J. Schmelzer, Assistant Attorney General, Madison, WI, for Defendants.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action for injunctive and monetary relief, brought pursuant to 42 U.S.C. § 1983. Currently before the court is defendants' motion for summary judgment on the merits of plaintiff's claims. In a separate opinion, entered on December 7, 2006, I have considered whether five of plaintiff's claims should be dismissed for plaintiff's failure to exhaust his administrative remedies and concluded that plaintiff exhausted his administrative remedies with respect to all but one of his claims. Plaintiff exhausted his claims that defendants Ruth Tritt, Marty Schroeder, Mary Hopfensperger, Officer Vilski, Tim Pierce and Rebecca Blodgett violated his First Amendment right to free speech by (1) refusing to deliver numerous magazines to which plaintiff subscribed because they contained "gang signs"; (2) prohibiting plaintiff from possessing three "art books" because defendants deemed them pornographic; (3) prohibiting plaintiff from possessing an atlas and (4) refusing to deliver to plaintiff a newsletter regarding prison medical care, with one exception; he did not exhaust his claim that defendant Tritt violated plaintiff's First Amendment rights by denying him delivery of the December 2004 issue of *Maxim* magazine. Moreover, plaintiff exhausted his Eighth Amendment claims against defendants Judy Smith, Tom Edwards, Nurse Carivou and Dr. Chan.

Defendants' motion for summary judgment will be granted with respect to all but two of plaintiff's claims. Plaintiff's claims regarding defendants's refusal to deliver "art books" because they contained pornography is governed by the settlement in *Aiello* and may not be raised in this lawsuit. Second, defendants have adduced sufficient evidence that the decision to prohibit delivery of an atlas to plaintiff was reasonably related to a legitimate penological interest. Plaintiff contends that Department of Corrections policies prohibiting the delivery of publications that contain gang symbols violate his First Amendment rights on their face, but this challenge fails because the regulation is reasonably related to the legitimate penological interest of maintaining institutional security. Defendants' motion for summary judgment will be granted with respect to plaintiff's claims that defendants misapplied these regulations when they refused to deliver to him the March 2005 issue of *FHM*, because, from the undisputed facts, a jury could not reasonably infer that this decision was an arbitrary or irrational application of the regulations. Finally, defendants' motion for summary judgment will be granted with respect to all of plaintiff's Eighth Amendment medical care claims because plaintiff has failed to propose facts from which a reasonable jury could infer that defendants displayed deliberate indifference to his serious medical needs by (1) failing to insure that he had bottles of his prescription Nasacort at all times; (2) providing him with incorrect medication on one occasion; (3) allowing him to be exposed to second-hand smoke; and (4) refusing to allow him to see an eye doctor for several months. Defendants' motion for summary judgment will be stayed with respect to plaintiff's claims that he was wrongfully denied the July 2003 issue of *FHM* and the June 2003 issue of *Rolling Stone* because I cannot determine the merits of plaintiff's claims without reviewing the allegedly objectionable images.

■ Before setting out the facts, I must address two preliminary matters. First,

plaintiff has asked for reconsideration of an order entered in this case on October 26, 2006, in which I ruled that the court would not consider affidavits and other exhibits that plaintiff filed with the court but did not send to defendants. Plaintiff's motion for reconsideration will be denied. Plaintiff contends that he should be excused from the requirement of sending these materials to defendants' counsel because photocopying the materials could be construed as a violation of the Oshkosh Correctional Institution policy that requires prisoners to "drop off only [their] own legal or personal material for photocopying."

Plaintiff has not submitted any documentation to support his interpretation of the prison policy. His view seems nonsensical. In the past, prisoners have had no difficulty securing affidavits from fellow inmates on matters pertaining to their lawsuits. Such affidavits *are* their "legal material." If prison officials were to punish an inmate for obtaining eyewitness testimony concerning claims raised in his lawsuit, that inmate may well have a strong case against those officials for interfering with his right of access to the courts. Because plaintiff has suggested no valid reason to disturb the decision to disregard the affidavits that he failed to serve on defendants, his motion for reconsideration will be denied.

■ Second, one of plaintiff's First Amendment claims is that defendants wrongfully refused to deliver to him a newsletter from the "Jeff Dicks Medical Coalition." Defendants assert that the newsletter contained statements that were either attempts to solicit money from prisoners or encouragement to solicit money from others, in violation of Department of Corrections policy. Defendants did not include a copy of this newsletter for an *in camera* review by the court. However, plaintiff did provide the court with his copy of the newsletter, along with the other documents that he submitted to the court but did not serve on defendants. Dkt. # 51, Exh. 40. Plaintiff does not explain how he came to possess the newsletter after it had been denied to him. As noted above, I have generally disregarded material that plaintiff failed to serve on defendants. However, in the interest of equity and efficiency, I have reviewed the content of the newsletter from Jeff Dicks Medical Coalition; as noted above, I will grant defendants' motion for summary judgment on this claim.

From the parties' proposed findings of fact and supporting materials, I find the following to be material and undisputed.

## FACTS

### A. *Parties*

Plaintiff Larry George is a prisoner who was housed at the Oshkosh Correctional Institution at all times relevant to this lawsuit.

Defendant Judy Smith is Warden of the Oshkosh Correctional Institution, a position she has held since September 29, 1996. Defendant Ruth Tritt is a correctional officer at the Oshkosh Correctional Institution, a position she has held since May 25, 1997. Defendant Martin Schroeder was previously employed as the disruptive group gang coordinator at the Oshkosh Correctional Institution. He held this position from June 1989 until his retirement in January 2004. Defendant Rebecca Blodgett is a corrections unit supervisor at the Oshkosh Correctional Institution. Defendant Blodgett has been the disruptive group coordinator at the Oshkosh Correctional Institution since February 2002. Defendant Laura Vilski is a correctional officer at the Oshkosh Correctional Institution, a position she has held since May

**912**

25, 1997. Defendant Tai Chan is an optometrist who has been employed by the Wisconsin Department of Corrections since September 1998. Defendant Chan works at four correctional institutions, including the Oshkosh Correctional Institution. Defendant Thomas Edwards is the health services manager at the Oshkosh Correctional Institution, a position he has held since July 19, 1998. Defendant Edwards has been a licensed registered nurse since October 1982. Defendant Wendy Carivou is a registered nurse at the Oshkosh Correctional Institution, a position she has held since June 2, 2002. Defendant Timothy Pierce is an inmate complaint examiner at the Oshkosh Correctional Institution, a position he has held since August 17, 1986.

### B. *Gang Policy at the Oshkosh Correctional Institution*

Gangs threaten, coerce and harass others, engage in illegal activities or encourage them and generally pose a threat to correctional staff and prisoner safety in correctional institutions. The presence of gangs and the possibility of gang violence undermine prison authority and intimidate others.

Correctional officers have a responsibility to suppress and manage gang activity and reduce the number of violent gang-related incidents. In carrying out this responsibility, correctional officers search prisoners' living areas and monitor their telephone conversations and incoming and outgoing mail. These activities are intended to reduce covert communications by prisoners involved in gangs, so as to reduce the number of incidents of strong-arming and intimidation, the risk of assaults on staff and other prisoners and the possibility of organized disturbances. In spite of these efforts, there is still gang activity within the Oshkosh Correctional Institution, which houses approximately 309 confirmed gang members and 73 suspected gang members.

Gangs often use hand signals to communicate covertly with other gang members and to antagonize rival gangs. These hand signals are commonly called "gang signing." Signs and gestures may have vastly different meanings among different gangs and may be used to convey feelings or direct actions. Gang signing may direct a gang member to punish another gang member or fight a rival gang member.

To prevent or impede gang members from passing messages through signs, the prison's policy is to make the passage of messages as difficult as possible. Department of Corrections policy prohibits prisoners from receiving or possessing publications that include depictions of gang signs, symbols and other identifiers. Prison security staff reviews incoming publications to determine whether they may be provided to prisoners. If a publication contains a depiction of gang signs, prison officials do not remove the depiction or black it out, but withhold the publication from prisoners. Plaintiff believes that publications including these gang signs and symbols are present at the Oshkosh Correctional Institution in spite of the policy.

### C. *Denial of Publications*

#### 1. *Three "art books"*

Defendant Schroeder reviewed three books that plaintiff had ordered, which had been sent to the mailroom at the Oshkosh Correctional Institution, and determined that all three contained pictures of nudity and sexually explicit pictures. The titles were: *Enjoying Sex*, The Pocket Guide to Good Sex, and Don't Call Me Shirley. Defendant Schroeder ordered the books sent out of the institution.

### 2. *Atlas*

On approximately July 15, 2002, an atlas that plaintiff ordered was delivered to the Oshkosh Correctional Institution. Defendants Schroeder and Hopfensperger determined that plaintiff's possession of the atlas raised security concerns. One of the primary security concerns at correctional institutions is preventing prisoners from escaping. Maps and atlases are available to prisoners in the library at the Oshkosh Correctional Institution but prisoners are not allowed to take the maps and atlases out of the library. Defendants have determined that prisoners' unmonitored use of atlases would raise escape concerns.

### 3. *Newsletter from Jeff Dicks Medical Coalition*

On approximately July 15, 2002, defendant Schroeder reviewed a newsletter addressed to plaintiff from "Jeff Dicks Medical Coalition" and determined that the newsletter was an attempt to solicit money from plaintiff or encourage him to solicit money from others. Defendant ordered the newsletter withheld from plaintiff because solicitations to or from prisoners could lead to strong-arming or other illegal activities.

The text on the first page of the newsletter encourages readers to "Talk to your families. Talk to your loved ones and pen pals. Tell them to join in the fight, to contact me today." In addition, on the last page of the newsletter, readers are asked to "Help us today. Send donations, stamps to help us to stamp out medical abuses." Elsewhere in the newsletter, prisoners are asked to send stories of poor medical care to the coalition, along with a self-addressed stamped envelope.

### 4. *Magazines to which plaintiff subscribed*

Defendant Schroeder reviewed the June 2003 issues of *Rolling Stone* and *Us Week-*

*ly,* the August 2003 issues of *Spin* and *Rolling Stone,* the September 2003 issue of *Maxim* and the October 2003 issue of *Spin* when they were delivered to the Oshkosh Correctional Institution. He determined that the cover and page 92 of the June 2003 issue of *Rolling* Stone, pages 12 and 21 of the June 2003 issue of *Us Weekly,* pages 30 and 113 of the August 2003 issue of *Spin,* pages 12 and 21 of the August 2003 issue of *Rolling Stone,* page 157 of the September 2003 issue of *Maxim* and page 37 of the October 2003 issue of *Spin* contained pictures depicting gang-signing and should not be delivered to prisoners. Defendant Vilski signed and sent plaintiff notices of non-delivery of mail regarding the June 2003 issue of *Us Weekly,* the August 2003 issue of *Spin* and the October 2003 issue of Spin. Defendant Tritt signed and sent plaintiff notices of non-delivery of mail regarding the June 2003 and August 2003 issues of *Rolling Stone* and the September 2003 issue of *Maxim.*

Defendant Blodgett reviewed the March 2004, January 2005 and May 2005 issues of *Spin,* the December 2004 issues of *Blender, Maxim* and *Rolling Stone* and the March 2005 issue of *FHM.* She determined that pages 21 and 25 of the March 2004 issue of *Spin,* pages 154 and 167 of the December 2004 issue of *Blender,* page 117 of the December 2004 issue of *Maxim,* pages 36 and 46 of the December 2004 issue of *Rolling Stone,* pages 15 and 8 of the January 2005 issue of *Spin,* page 88 of the March 2005 issue of *FHM* and the May 2005 issue of *Spin* contained pictures depicting gang-signing and should not be delivered to prisoners. Defendant Tritt signed and sent plaintiff notices of non-delivery of mail regarding all of these magazines except the May 2005 issue of *Spin.* An unidentified member of the Oshkosh Correctional Institution mailroom staff sent that notice.

The September 2002 issue of *Spin*, September 2002 issue of *Stuff*, March 2004 issue of *Razor*, March 2004 issue of *Maxim* and the February 2005 issue of *Spin* were prohibited within the Oshkosh Correctional Institution and, therefore, were not delivered to plaintiff when his copies arrived in the mail. The September 2002 issue of *Spin*, September 2002 issue of *Stuff* and the February 2005 issue of *Spin* were placed on the "prohibited publications" list at the Oshkosh Correctional Institution because they contained pictures of hand-gestures identified as gang-signing. The March 2004 issue of *Razor* and the March 2004 issue of *Maxim* contained pictures of Nazi-related tattoos and terrorists, respectively. Defendant Vilski signed and sent plaintiff notices of non-delivery of mail regarding the September 2002 and February 2005 issues of *Spin*. Defendant Tritt signed and sent plaintiff notices of non-delivery of mail regarding the September 2002 issue of *Stuff* and the March 2004 issues of *Razor* and *Maxim*.

On June 13, 2003, plaintiff filed an inmate complaint, in which he stated that he had been wrongfully denied the July 2003 issue of *FHM*. (Neither party has proposed facts suggesting why the publication was denied.)

### D. *Medical Claims*

#### 1. *Plaintiff's Nasacort prescription*

Plaintiff has been diagnosed with asthma. Asthma is a disease that causes the airways of the lungs to become constricted or blocked; this constriction makes breathing more difficult. Asthma has no cure, but most patients can be symptom-free or reduce the occurrences of symptoms. External factors may affect a patient's asthma, including time of year, allergies and use of medication. Plaintiff's medication for asthma included albuterol, Advair and zafirlucast. During August and September 2002, plaintiff was seen by health services staff on several occasions. Records from these visits do not indicate that plaintiff complained of increased symptoms. At plaintiff's October 28, 2002 examination, he said that the last time his asthma symptoms had been exacerbated was six weeks earlier, when he had an upper respiratory infection. Plaintiff had asthma "flare-ups" on November 19, 2003, October 1, 2004 and December 6, 2005. These "flare-ups" were caused by plaintiff's failure to use his medication correctly and an upper respiratory infection. Plaintiff's other medical records indicate that his asthma was well controlled.

At times relevant to this complaint, plaintiff had a prescription for the drug Nasacort. Nasacort is a nasal decongestant used to treat symptoms of allergies and other "seasonal reactions." Plaintiff took Nasacort as part of his asthma treatment, but it was not medically necessary for this purpose. Plaintiff kept a plastic spray bottle of Nasacort in his cell and was directed to use two sprays in each nostril every night. Used as directed, each bottle was expected to last approximately one month. Plaintiff was provided with bottles of Nasacort on February 4, February 12, February 28, March 30, April 30, May 17, June 4, June 28, July 26, August 19, September 10, October 15, November 4, November 26, December 18 and December 26, 2002. He was provided with bottles of Nasacort on January 13, February 10, March 3, April 8 and April 28, 2003.

Nasacort is a prescription drug. Therefore, prisoners must contact the physician or nurse practitioner in order to get refills. Typically, prescription drugs are not provided to prisoners on an "open-ended" basis. This is done to ensure that the health care provider can monitor the drug's effect on the prisoner's health and medical conditions. Prisoners are responsible for sub-

mitting written refill requests before their medications run out.

### 2. *Receipt of medication contraindicated for asthma patients*

Plaintiff filed inmate complaint number OSCI–2002–23945 on July 4, 2002. In that inmate complaint, he alleged that sometime after 3:30 p.m. on June 27, 2002, a nurse in the Health Services unit gave him "NasaCrom," a medication that is not to be taken for asthma.

Nurse Carivou was not on duty after 3:30 p.m. on June 27, 2002.

### 3. *Eye care*

The Department of Corrections employs defendant Chan as an optometrist. Defendant Chan is the only state-employed optometrist for state correctional institutions. He travels among the institutions to provide regular eye care to prisoners. Among other services, defendant Chan conducts general eye examinations and sees patients who are experiencing problems with their eyes. Neither defendant Chan nor defendant Edwards was involved in scheduling defendant Chan's appointments; instead, this was done by the health services unit support staff.

The waiting time for inmates to see defendant Chan can be three or four months for a general, routine eye examination. Prisoners with emergencies and urgent cases are scheduled for appointments as soon as possible and are given priority appointments or are sent to a local emergency room.

In June 1999, November 2000, May 2003 and August 2004, plaintiff received routine examinations from defendant Chan. During plaintiff's examination on May 12, 2003, plaintiff said that he had problems reading and requested a prescription for sunglasses for use indoors and outdoors. From his examination of plaintiff, defendant Chan determined that plaintiff did not have a medical condition related to his eyes that required him to wear dark-tinted glasses indoors. Defendant Chan gave plaintiff permission to order dark-tinted glasses for use outdoors.

During defendant Chan's examination of plaintiff on August 4, 2004, plaintiff said that he had watery eyes and problems focusing. Defendant Chan did not find a related medical problem. However, defendant Chan prescribed a pair of clear, single vision reading glasses, which plaintiff received on September 2, 2004.

On August 11, 2005, defendant Chan examined plaintiff's eyes after plaintiff's name tag blew into his right eye. Defendant Chan found no significant problems.

Plaintiff's ophthalmology records indicate that in April 1989, an ophthalmologist determined that plaintiff's eyes tended to be watery and light sensitive. Defendant Chan did not find any light sensitivity during any of his examinations of plaintiff.

### 4. *Exposure to second-hand smoke*

On multiple occasions following his transfer to Oshkosh Correctional Institution in February 2002, plaintiff was exposed to second-hand smoke indoors and outdoors at the Oshkosh Correctional Institution. Before August 1, 2006, when the institution became smoke-free in its entirety, staff were allowed to smoke outdoors in designated areas not frequented by inmates. Staff smoked on the "rec. field," outside the front doors of buildings through which plaintiff had to walk.

Oshkosh Correctional Institution became smoke-free for inmates on May 1, 2006. Before that time, inmates were not permitted to smoke in any room or interior space at the institution. They were allowed to smoke outdoors in designated areas and only during specific times. Nevertheless, numerous inmates were caught smoking in their rooms or in bathrooms.

Dr. Nancy Bowens is the provider of record in monitoring and treating plaintiff's asthma. During August and September 2002, plaintiff was seen by HSU staff on several occasions. The records documenting those visits do not indicate that plaintiff reported any complaints of increased asthma symptoms. Dr. Bowens examined plaintiff on October 28, 2002, at which time plaintiff reported that his last exacerbation of asthma symptoms occurred approximately six weeks earlier because of an upper respiratory infection. After examining plaintiff, Bowens determined that his asthma symptoms were under control with his current medications. Plaintiff experienced flare-ups of asthma symptoms on November 19, 2003, October 1, 2004 and December 6, 2005. Plaintiff believes he had a second asthma attack in late December 2005.

The health records maintained by defendants relating to plaintiff indicate that plaintiff's November 19, 2003 flare-up was aggravated by his noncompliance with the standards for the use of the inhalers, the October 1, 2004 flare-up was aggravated by an upper respiratory infection and the December 6, 2005 flare-up was aggravated by plaintiff's sporadic use of inhalers. The health records do not indicate that plaintiff complained or alleged that second-hand smoke aggravated his asthma symptoms on any of these dates. As for plaintiff's late December episode, medical personnel diagnosed plaintiff with a panic attack.

At no time was defendant Smith aware that plaintiff's exposure to second-hand smoke could aggravate his asthma condition while he was incarcerated at Oshkosh Correctional Institution or in the future.

## DISCUSSION

### A. *Books Denied as Pornography*

■ Plaintiff challenges prison officials' refusal to deliver "art books" to him that defendants Schroeder and Hopfensperger classified as pornographic. Plaintiff should be well aware that, as an adult prisoner in the Wisconsin prison system, he is a member of the class in *Aiello v. Litscher*, and that he is bound by the settlement agreement reached in that case regarding the types of descriptions and depictions of sex and nudity that would be permitted within the Wisconsin prison system. Any class member who believes that prison officials have wrongly denied him materials permissible under the settlement agreement has two potential remedies: he may bring suit in state court or he may contact the lawyer representing the class in *Aiello*. What the prisoner may not do is what plaintiff did here, which is to bring an individual law suit in federal court regarding the alleged violations. *Kaufman v. McCaughtry*, No. 03–C–27–C, 2003 WL 23218305 (W.D.Wis. April 24, 2003); *see also Kaufman v. McCaughtry*, 419 F.3d 678, 685 (7th Cir.2005). Earlier in this lawsuit, plaintiff was denied leave to proceed on his claims that prison officials wrongfully denied him magazines that contained "pornographic" materials. Had plaintiff included any information about why the "art books" had been denied, these claims would have been dismissed at screening as well.

Plaintiff argues that the terms of the settlement in *Aiello* do not preclude his claims in this lawsuit because the denial of the books was more than "an isolated misinterpretation of the rules regarding sexually explicit materials ... by line staff." He bases this argument on the fact that inmate complaint reviewers approved defendants Schroeder's and Hopensperger's determinations that the books were contraband when plaintiff appealed the decision through the inmate complaint process. Plaintiff's interpretation of the settlement

agreement is flawed. Plaintiff's claim regarding the denial of books he believes are art and not pornography falls squarely within the terms of the *Aiello* settlement agreement, even if upper level Department of Corrections officials affirmed defendants Schroeder's and Hopensperger's initial decisions.

Alternatively, plaintiff seems to argue that the Department of Corrections is not following the terms of the *Aiello* settlement agreement that are codified in DOC § 309. Again, if his contention is that prison officials are violating DOC § 309, this is a claim arising under state law that must be brought in state court.

### B. *Remaining First Amendment Claims*

■ I granted plaintiff leave to proceed on his claim that defendants violated his First Amendment right to free speech by refusing to deliver various publications to him. Plaintiff has not forfeited all of his constitutional rights as a result of his conviction and incarceration. *Thornburgh v. Abbott,* 490 U.S. 401, 407, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989); *Turner v. Safley,* 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). However, the Supreme Court has stated repeatedly that "[t]he fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration." *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 125, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) (*citing Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974)). A prisoner retains only those First Amendment rights that are "not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell,* 417 U.S. at 822, 94 S.Ct. 2800;

*see also Shaw v. Murphy,* 532 U.S. 223, 229, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001) (some First Amendment rights are simply inconsistent with status of incarceration).

■ In *Turner,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64, the Supreme Court established the test that governs a challenge to a prison regulation on the ground that it restricts an inmate's First Amendment rights. Under *Turner,* a prison regulation is valid so long as it is "reasonably related to a legitimate penological interest." *Id.* at 89, 107 S.Ct. 2254. A regulation cannot be sustained where the logical connection to a legitimate interest is "so remote as to render the policy arbitrary or irrational." *Id.* at 89–90, 107 S.Ct. 2254. The Court outlined four factors that are considered when reviewing a prison regulation: (1) the existence of a valid, rational connection between the prison regulation and the legitimate governmental interest; (2) whether there are alternative means of exercising the constitutional right open to the prisoner; (3) the impact of the accommodation of the asserted constitutional right on guards, other inmates and institution resources; and (4) the existence or absence of ready alternatives to the prison regulation that can be provided at *de minimis* cost to the institution. *Turner,* 482 U.S. at 89–91, 107 S.Ct. 2254. Courts have acknowledged that these factors tend to blend together and are not meant to be weighed according to any precise formula. *Waterman v. Farmer,* 183 F.3d 208 (3d Cir.1999); *Amatel v. Reno,* 156 F.3d 192 (D.C.Cir.1998); *Aiello v. Litscher,* 104 F.Supp.2d 1068, 1075 (W.D.Wis.2000).

■ In addition, it is well established that a court may not substitute its own judgment for that of prison officials when reviewing the validity of prison regulations. *Thornburgh,* 490 U.S. at 407–08, 109 S.Ct. 1874; *Turner,* 482 U.S. at 89, 107 S.Ct. 2254; *Aiello,* 104 F.Supp.2d at 1075

(courts do not second-guess prison administrators lightly). Deference to prison officials is appropriate because the judiciary does not possess the necessary expertise and resources to deal with the "difficult and delicate problems of prison management." *Thornburgh,* 490 U.S. at 407, 109 S.Ct. 1874. When, as in this case, a state penal system is involved, the federal courts have further reason to accord deference to prison authorities. *Turner,* 482 U.S. at 85, 107 S.Ct. 2254; *Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). Finally, this court is mindful of the Supreme Court's statement that "where the regulations at issue concern the entry of materials into the prison, . . . a regulation which gives prison authorities broad discretion is appropriate." *Thornburgh,* 490 U.S. at 416, 109 S.Ct. 1874.

In *Shaw,* 532 U.S. 223, 121 S.Ct. 1475, 149 L.Ed.2d 420, the Supreme Court held that the *Turner* test governs judicial review of specific applications of prison regulations as well as facial challenges. In remanding the case for a determination whether a specific application of a prison regulation was acceptable, the Court stated that "[u]nder *Turner,* the question remains whether the prison regulations, as applied to [plaintiff], are reasonably related to legitimate penological interests." *Id.* at 232, 121 S.Ct. 1475 (internal citation omitted). The emphasis the Court placed on the first *Turner* factor hints at the reality that when a case involves a challenge to a prison regulation as applied in a specific instance, as opposed to a challenge to the regulation on its face, it is not necessary to frame the analysis in terms of all four factors set forth in *Turner.* By definition, a regulation that is permissible under the *Turner* test is reasonably related to a legitimate penological interest. Therefore, actions taken by prison officials that are consistent with such a regulation

are permissible under *Shaw.* Where the regulation itself is valid, the only question that remains for a court is whether the actions being challenged are consistent with the regulation. *Shaw,* 532 U.S. at 232, 121 S.Ct. 1475.

1. *Newsletter from Jeff Dick's Medical Coalition*

■ Plaintiff contends that defendant Schroeder wrongfully denied him a newsletter from Jeff Dick's Medical Coalition, in violation of his First Amendment rights. In response, defendants argue that defendant Schroeder was simply applying Wis. Admin. Code § DOC 309.04(4)(c)(7), which states that "the department shall apply the following restrictions to all inmate correspondence: . . . (c) [t]he department may not deliver incoming or outgoing mail if it does any of the following: . . . 7. Solicits gifts from a person other than a family member or a person on the visiting list." Plaintiff does not argue that the policy is unconstitutional, but instead that defendant Schroeder misapplied this code section when he determined that it barred plaintiff from receiving the newsletter. Plaintiff's claim falls within the situation contemplated by *Shaw,* that is, whether a specific application of a permissible prison regulation was appropriate. *Id.* at 232, 121 S.Ct. 1475.

Jeff Dick's Medical Coalition appears to be an organization that is an advocate for health care improvements in prison. A section of the first page of the newsletter encourages readers (presumably prisoners) to "[t]alk to your families. Talk to your loved ones and pen pals. Tell them to join in the fight, to contact me today." In addition, on the last page of the newsletter, readers are asked to "Help us today. Send donations, stamps to help us to stamp out medical abuses." Elsewhere in the newsletter, prisoners are asked to send

stories of poor medical care to the coalition, along with a self-addressed stamped envelope.

■■■■ Courts are required to give considerable deference to prison administrators' decisions on the application of particular policies. *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The language of the newsletter is somewhat ambiguous. It may be read narrowly to encourage prisoners to subscribe to the newsletter and seek emotional or political support from friends and family. Alternatively, it may be read to exhort prisoners to "join the fight" by contributing a donation to the coalition themselves and to ask others to send donations to the coalition. Giving defendant Schroeder's decision the deference it is due, I find that his application of the cited policy was a reasonable application of prison policy and will grant defendants' motion for summary judgment with respect to this claim.

However, I am troubled by the handling of plaintiff's complaint by the Department of Corrections. The newsletter was not retained after defendant Schroeder denied delivery. Therefore, defendant Schroeder's decision was not subject to a substantive review by anyone else. During the inmate complaint review process, John Ray, the reviewing corrections complaint examiner, recognized this as a problem and recommended dismissal of plaintiff's complaint with the modification "that in the future, OSCI make a copy of the objectionable material for the file to create a record that can be reviewed by a third party 'after the fact.' " In his final decision, the Secretary rejected Ray's recommendation regarding the retention of denied documents, stating that "To require the institution to [make a copy] would create an undue administrative burden not required by the Administrative Code. The inmate retains appeal rights to the Warden under DOC 309.04(4)(f)."

In this case, plaintiff managed to secure a copy of the prohibited newsletter so that he could submit it to the court for review. It is unclear how this happened, but it unlikely to be repeated, for good reason: if prisoners could obtain copies of withheld materials for litigation purposes, they could obtain any publications they wanted, simply by filing suit. If, however, prisoners cannot submit copies of withheld publications and communications to the court and the Department of Corrections refuses to keep copies of allegedly objectionable materials, how will administrators and court undertake a meaningful review of the challenged decisions? In light of the fact that many printed materials are irreplaceable, prison officials' disposal of the documents may constitute a *de facto* unreviewable determination. Absent the documents themselves or authenticated copies, defendants will be unable to prevail on a motion for summary judgment and may well face consequences for spoliation of evidence.

### 2. *Atlas*

■■■■ Plaintiff contends that defendants violated his First Amendment rights by prohibiting him from possessing an atlas. Under *Turner*, a prison policy is valid if it bears a reasonable relationship to a legitimate penological interest. 482 U.S. at 89, 107 S.Ct. 2254. Here, defendants' stated interest is central to the management of correctional institutions, that is, maintaining institutional security by preventing escape. As the United States Supreme Court has noted, "prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry." *Wolfish*, 441 U.S. 520, 546–47, 99 S.Ct. 1861, 60 L.Ed.2d 447. The

connection between prisoners' possession of maps and the possibility of escape is not attenuated. If prisoners are able to study local roadways and topography at length, they may be able to plot escape routes. Whether plaintiff wanted to use his atlas for that purpose is immaterial to this determination. Plaintiff does not assert that he is not able to look at maps at all; he simply objects to restrictions that restrict the place and time that he may do so. However, the fact that prisoners are able to review maps in the prison library for legitimate purposes actually bolsters the conclusion that the prison's prohibition on unmonitored possession of maps is a minimally restrictive means of maintaining institutional security.

3. *Magazines to which plaintiff subscribed*

■ At screening, I understood plaintiff to allege that he was denied numerous magazines because defendants wrongly determined that they contained gang symbols. However, plaintiff has abandoned this argument on summary judgment with respect to all but three publications. Instead, he argues that the Wisconsin Department of Corrections regulations that prohibit prisoners from possessing materials that contain gang symbols violate his First Amendment rights because there is no legitimate penological reason for prohibiting prisoners from possessing publications that contain gang signing and symbols. Had plaintiff advanced this argument at screening, I would not have granted him leave to proceed on it. The legitimacy of prison regulations restricting prisoners' possession of materials containing "gang symbols" has been litigated in this court on several occasions. *See, e.g., Koutnik v. Brown*, No. 04–C–911–C, 2005 WL 552192 (W.D.Wis. Mar. 2, 2005) (affirmed by *Koutnik v. Brown*, 189 Fed. Appx. 546 (2006)); *Lindell v. Frank*, No.

05–C–003–C, 2005 WL 568070 (W.D.Wis. Mar. 8, 2005); *West v. Berge*, No. 05–C–37C, 2005 WL 1378908 (W.D.Wis. June 8, 2005). This court and the Court of Appeals for the Seventh Circuit have upheld repeatedly the legitimacy of the regulations challenged by plaintiff. *See id.* It is beyond question that prison officials have a compelling interest in implementing policies designed to combat the threat to institutional security posed by organized gang activity. *Rios v. Lane*, 812 F.2d 1032, 1037 (7th Cir.1987). It is unnecessary to revisit the issue, particularly when plaintiff's facts do not imply that the regulations he challenges are not reasonably related to this interest.

In addition to his facial challenge to Department of Corrections regulations, plaintiff disputes whether two of the magazines that were denied to him contained "contraband," by which I understand him to challenge defendants' application of the regulations. The magazines in question are the June 2003 issue of *Rolling Stone* and the March 2005 issue of *FHM*.

Whether the publications contain gang-related symbols is "an assessment that prison staff is uniquely suited to make." *Koutnik v. Brown*, 456 F.3d 777, 785 (2006). Courts give significant deference to decisions of this nature with good reason. Whether a photo of Lil John & the East Side Boyz making hand gestures includes problematic gang symbols is far from the court's area of expertise. *See, e.g., id.*

> Knowledge of prison gang symbols—how they are used and what they mean—is acquired primarily through interaction with, and observation of, prisoners. Additionally, gang symbolism is not static; symbols change and are added as gangs expand their bases and combine with other groups. Consequently, because the prison staff has

daily contact with gang members and because the number and kind of gang symbols do not remain constant, we shall defer to the staff's assessment that [plaintiff's] correspondence ... contained gang symbols.

*Id.* (citing *Beard v. Banks,* —— U.S. ——, ——, 126 S.Ct. 2572, 2578, 165 L.Ed.2d 697 (2006)); *Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974).

■■■ From an *in camera* examination of the March 2005 issue of *FHM,* I am persuaded that it was neither arbitrary nor irrational for defendant Blodgett to conclude that a picture on page 88 depicts gang-related hand signs. Therefore, defendants acted within their discretion in concluding that this publication "advocate[d] ... behavior consistent with a gang" and is prohibited by Wis. Admin. Code § DOC 309.04(4)(c)(10).

Defendants did not submit copies of the pictures included in the June 2003 issue of *Rolling Stone* for *in camera* review by the court or provide any information about the denial of the July 2003 issue of *FHM,* relying instead on an exhaustion argument. Therefore, I cannot decide at this time whether defendants are entitled to summary judgment with respect to either of these claims. With respect to the June 2003 issue of *Rolling Stone,* defendants submitted an affidavit from defendant Schroeder, in which he asserts that the cover and page 92 contained prohibited gang signs, but did not submit copies of the pictures themselves. By itself, the affidavit does not provide sufficient evidence to resolve this matter on summary judgment.

This case is perplexing. If defendants cannot produce the withheld materials, their motion will be denied and the case will proceed to trial where plaintiff will have to carry the burden of proving that the withheld publications were not gang-related. How can he do that if he does not have the actual documents? Can defendants prevent him from challenging the application of the rules to his mail simply by refusing to retain documentation of withheld materials?

Other questions come to mind when one considers the apparent oddity of allowing an inmate to bring a suit when he cannot aver of his own personal knowledge that a withheld publication does not contain the gang-related signs that prison officials say it does. If, however, no inmate could bring a suit to challenge the withholding of mail because he has no good faith basis on which to make the challenge, the prison's practices in this area would be unreviewable. And for those who fear a flood of filings if inmates are allowed to file suit every time a publication is withheld even if they cannot have a good faith basis for thinking their First Amendment rights are violated, the financial requirements of the Prisoner Litigation Reform Act provide adequate disincentives to inmate suits.

Courts cannot abdicate their duty to review the decisions of prison officials that affect the First Amendment rights of prisoners. Although the courts must give broad deference to prison decisions to withhold mail, particularly when it is allegedly gang-related, that deference is not unbounded. If the court were to rely upon prison officials' assurances that certain materials were properly denied to inmates rather than undertaking an independent review of the withheld materials, it would be turning deference into an unsupervised delegation of responsibility.

In this situation, if plaintiff can show that defendants have a practice of not retaining the actual documents or copies of them, I will consider allowing the jury to infer that the withheld documents would

be unfavorable to defendants, although defendants would have an opportunity to try to negate the implication. Such a solution is not entirely satisfactory, but it avoids the injustice of allowing defendants to destroy evidence without consequence and thereby prevent inmates from ever being able to bring a viable challenge to the validity of defendants' decisions to withhold publications on the ground that they depict gang-related matters.

In summary, defendants' motion for summary judgment will be granted with respect to plaintiff's claims that the publications listed in this opinion were not delivered to him in violation of his First Amendment rights, except the June 2003 issue of *Rolling Stone* and the July 2003 issue of *FHM*. I will stay a decision on defendants' motion for summary judgment on these two claims to allow defendants an opportunity to provide the court with copies of the pages of the publications that they believe contain contraband material. I will review those copies *in camera* to determine whether defendants' denial was reasonable. Once I determine the reasonableness or unreasonableness of the denial, I will grant or deny defendants' motion for summary judgment with respect to these claims. If defendants are unable to provide a copy of the objectionable material, it will be necessary to decide how the trial will proceed and specifically, whether to instruct the jury that it may infer from the destruction of the publications by defendants that their admission into evidence would not favor defendants.

### C. *Eighth Amendment Claims*

The Eighth Amendment requires the government "to provide medical care for those whom it is punishing by incarceration." *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir.1996) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). To prevail on an Eighth Amendment claim, a prisoner must show that prison officials were deliberately indifferent to his serious medical needs. *Estelle*, 429 U.S. at 106, 97 S.Ct. 285. Therefore, to withstand summary judgment, plaintiff must adduce facts from which a reasonable jury could infer that he had a serious medical need (objective component) and that prison officials were deliberately indifferent to this need (subjective component). *Id.* at 104, 97 S.Ct. 285; *see also Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir.1997). The Court of Appeals for the Seventh Circuit has held that "serious medical needs" encompass not only conditions that are life-threatening or that carry risks of permanent, serious impairment if left untreated, but also those in which the deliberately indifferent withholding of medical care results in needless pain and suffering. *Gutierrez*, 111 F.3d at 1371.

As for the Eighth Amendment's subjective component, the Supreme Court has held that deliberate indifference requires that "the official must both be aware·of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Inadvertent error, negligence, gross negligence or even ordinary malpractice are insufficient grounds for invoking the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir.1996); *see also Snipes*, 95 F.3d at 590–91. Deliberate indifference in the denial or delay of medical care is evidenced by a defendant's actual intent or reckless disregard. A prison official has a sufficiently culpable state of mind when the official "knew of a substantial risk of harm to the inmate and acted or failed to act in disregard of that risk." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir.2006) (citing *Walker v. Benjamin*, 293

F.3d 1030, 1037 (7th Cir.2002)). Negligence does not constitute deliberate indifference; therefore, even undisputed medical malpractice does not give rise to a constitutional violation. *Id.* To infer deliberate indifference on the basis of a physician's treatment decision, a fact finder must be able to say that the decision was so far afield of accepted professional standards as to imply that it was not actually based on a medical judgment. *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 262 (7th Cir.1996).

### 1. *Plaintiff's Nasacort prescription*

 Plaintiff's contention in his complaint and brief in opposition to summary judgment is that, on numerous occasions, defendants forced him to go for several days at a time without refills of his prescription Nasacort. However, plaintiff proposed no facts supported by admissible evidence to show when these alleged deprivations occurred or that this deprivation caused him any serious health effects.

As noted above, to prevail on an Eighth Amendment claim that his medical care amounted to cruel and unusual punishment, a plaintiff must show that he suffered from a serious medical need and that defendants were deliberately indifferent to this need. The Court of Appeals for the Seventh Circuit has determined that "asthma can be, and frequently is, a serious medical need" under the Eighth Amendment. *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir.2001). However, for his claim to survive summary judgment, plaintiff needed to provide some evidence from which it could be inferred that his asthma was exacerbated by defendant's failure to consistently provide him with Nasacort. He has not done so. Accordingly, defendants' motion for summary judgment will be granted.

### 2. *Receipt of medication contraindicated for asthma patients*

 In an inmate complaint filed on July 4, 2002, plaintiff alleged that on June 27, 2002, after 3:30 p.m., he had been given NasaCrom, a medication that is not to be taken for asthma. In response to defendants' motion for summary judgment, however, he did not propose any facts on this point. The undisputed facts reveal that Nurse Carivou was not on duty at that time plaintiff contended he was given the wrong medicine. As a result of plaintiff's failure to present any admissible evidence in support of his claim, defendants are entitled to summary judgment on this claim.

### 3. *Eye care*

In his complaint, plaintiff alleged that defendants Chan and Edwards exhibited deliberate indifference to his serious medical needs when they made him wait several months for an eye examination. However, the undisputed facts show that plaintiff's eye condition did not constitute a serious medical need and that defendants Chan and Edwards were not deliberately indifferent to plaintiff's need.

The parties dispute whether defendant Edwards "knew about [plaintiff's] eye problems." However, even if defendant Edwards was aware of plaintiff's eye problems, plaintiff has presented no evidence to suggest that Edwards had any role in scheduling plaintiff's eye examinations or in diagnosing his eye problems.

 In any event, plaintiff has failed to put in proof of a serious medical need. He alleged in his complaint that he suffered from extreme light-sensitivity and watery eyes but none of the facts adduced by either party support this contention. Rather, the facts show that defendant Chan did not find plaintiff's eyes to be particularly light sensitive. The only evi-

dence that plaintiff might have suffered from these conditions is an ophthalmologist's report in plaintiff's medical file dated 1989, more than fourteen years before defendant Chan examined plaintiff.

■ Defendants acknowledge that prisoners sometimes are not able to see an eye doctor for several months after requesting a routine appointment. However, the very nature of a "routine" eye examination implies no serious medical need and the waiting time alone would not constitute deliberate indifference. Defendants' motion for summary judgment will be granted with respect to plaintiff's claim that defendants Edwards and Chan violated his Eighth Amendment rights by requiring him to wait for several months before securing an appointment with an eye doctor.

### 4. *Exposure to second-hand smoke*

When I granted plaintiff leave to proceed on his Eighth Amendment claim concerning second-hand smoke, I construed the claim as a challenge to the smoking policy at the Oshkosh Correctional Institution during the time plaintiff was incarcerated there and I allowed plaintiff to proceed on that claim against the warden of the institution, defendant Judy Smith.

■ In *Helling v. McKinney*, 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993), the Supreme Court held that a prison inmate could challenge as a violation of the Eighth Amendment his involuntary exposure to environmental tobacco smoke. However, the Court did not recognize an absolute right to a smoke-free environment. Rather, the Court held that the plaintiff must satisfy a two-part test to succeed on such a claim. First, there is an objective component in which the plaintiff must show that he is "being exposed to unreasonably high levels of [environmental tobacco smoke]." *Id.* at 35, 113 S.Ct. 2475. An unreasonably high level is one that

"pose[s] an unreasonable risk of serious damage to his [current or] future health." *Id.* Second, the plaintiff must prove that the defendant exposed him to second hand smoke with "deliberate indifference" to his health or safety. *Id.* A prison official acts with deliberate indifference when she "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970.

■ The facts in this case fall far short of supporting an inference that plaintiff was exposed to unreasonably high levels of environmental tobacco smoke. The only smoking allowed under defendant Smith's policy was smoking outdoors. Plaintiff does not suggest that he was required to stand or sit next to staff or inmates while they were smoking outdoors or that he was required to linger in the doorways where staff may have been smoking. Further, he put in no evidence to show how often he was in a position to inhale unreasonably high levels of second-hand smoke from inmates violating the smoking policy or that defendant Smith knew that he was being so exposed.

The only evidence touching on the possible effects of second-hand smoke undercuts plaintiff's claim. Plaintiff's medical records reveal that he was seen for complaints relating to his asthma on only four occasions over a period of three years and that he did not claim second-hand smoke to be a potential cause of the first three flare-ups. The records suggest that plaintiff's late December episode was not an asthma flare-up at all, but rather a panic attack. Even if plaintiff's medical records did corroborate plaintiff's argument that he was exposed to unreasonably high lev-

els of second-hand smoke given his asthma, he has supplied no evidence to suggest that defendant Smith was aware of his medical condition, knew that second-hand smoke was exacerbating his condition and refused to do anything about it.

When a defendant moves for summary judgment, the plaintiff still bears the burden of insuring that all of the essential elements of his claim have been presented to the court in factual propositions supported by admissible evidence. Because plaintiff failed to propose facts sufficient to show that defendant Smith violated his Eighth Amendment rights with respect to the smoking policy in place at the Oshkosh Correctional Institution at all times relevant to plaintiff's claim, defendants are entitled to summary judgment on the claim.

## ORDER

IT IS ORDERED that

1. Plaintiff's motion for reconsideration of this court's October 26, 2006 order is DENIED.

2. The motion for summary judgment of defendants Judy Smith, Ruth Tritt, Marty Schroeder, Officer Vilski, Tim Pierce, Nurse Carivou, Rebecca Blodgett, Tom Edwards, Mary Hopfensperger and Dr. Chan is GRANTED with respect to plaintiff's claims that defendants Tritt, Schroeder, Vilski, Blodgett and Hopfensperger violated plaintiff's First Amendment rights when they denied delivery of all publications at issue in this case except the July 2003 issue of *FHM* and the June 2003 issue of *Rolling Stone*. Defendants' motion is GRANTED with respect to plaintiff's claims that defendants Smith, Carivou, Edwards and Chan were deliberately indifferent to his serious medical needs.

3. Plaintiff's claims against defendant Vilski regarding the denial of the July 2003 *FHM* and Tritt regarding the June 2003 issue of *Rolling Stone* are STAYED and defendants are directed to submit a copy of the offending pages for an *in camera* review by the court no later than January 5, 2007.

4. Defendants Smith, Schroeder, Pierce, Carivou, Blodgett, Edwards, Hopfensperger and Chan are DISMISSED from this action.