In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 05-3193

JOSEPH D. KOUTNIK,

*Plaintiff-Appellant*,

*v.*

LEBBEUS BROWN, GERALD A. BERGE,
Warden, and MATTHEW J. FRANK,
Secretary,

*Defendants-Appellees*.

———————

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 04 C 580—**Barbara B. Crabb**, *Chief Judge.*

———————

SUBMITTED MARCH 28, 2006—DECIDED AUGUST 8, 2006

———————

Before RIPPLE, KANNE and SYKES, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Wisconsin prisoner Joseph Koutnik brought this action under 42 U.S.C. § 1983 after an employee of the prison in which he is incarcerated seized an article of his outgoing mail. Mr. Koutnik claims that the Wisconsin regulation relied upon by the defendants to justify the seizure violates the First Amendment on its face and as applied to him; he also claims that the defendants' actions violated his substantive due process rights. The district court dismissed Mr. Koutnik's facial challenge and his due

process claim, and it granted summary judgment to the defendants on his remaining First Amendment claim. For the reasons set forth in this opinion, we affirm the judgment of the district court.

# I

## A.

Mr. Koutnik is confined at the Wisconsin Secure Program Facility. In December 2002, he placed in the outgoing mail a letter addressed to Northern Sun Merchandising ("Northern Sun"), a company that sells politically oriented products, including t-shirts, posters and stickers. Northern Sun invites design proposals for its products and pays royalties if an idea is marketed successfully. Mr. Koutnik's letter encouraged Northern Sun to add communist-themed posters to its product line and also suggested developing a line of small posters targeted at inmates who are prohibited by prison regulations from possessing stickers and large posters. Mr. Koutnik also wrote: "I noticed that prison reform is not as well represented as is needed and am therefore including some of my ideas you should consider using. [L]et me know what you think." R.10, Ex.D. Several designs were included as attachments. One, taking a page to itself, was a drawing of a swastika textured with the image of cell bars. Above the swastika was the slogan "The Department of Corruptions," and below it was the slogan "Keeping Kids in Kages" written with enlarged, stylized capital Ks. *Id.*, Ex.F.

Lebbeus Brown, then a lieutenant at the facility, prevented Mr. Koutnik's letter from being sent. He issued a "Notice of Non-Delivery of Mail," advising Mr. Koutnik that the

swastika drawing violated Wisconsin Administrative Code DOC § 303.20. In relevant part, that section provides:

> Any inmate who participates in any activity with an inmate gang, as defined in [§] DOC 303.03(11), or possesses any gang literature, creed, symbols or symbolisms is guilty of an offense. An inmate's possession of gang literature, creed symbols or symbolism is an act which shows that the inmate violates the rule. Institution staff may determine on a case by case basis what constitutes an unsanctioned group activity.

Wis. Admin. Code DOC § 303.20(3). Lieutenant Brown later would explain that, based on his training and experience, he believes the swastika to be "a symbol of Aryan pride and white supremacy, as well as racial hatred." R.15 at 8. Moreover, in this particular instance, he perceived the capital Ks and the misspelling of "cages" in "Keeping Kids in Kages" as a reference to the Ku Klux Klan. *Id.* at 9. The Klan is not a sanctioned group at the facility, *see* Wis. Admin. Code DOC § 309.365(c)(1), and Lieutenant Brown reasoned that Mr. Koutnik "was identifying with and trying to promote the growth of white supremacy groups while merchandizing white supremacy material," R.15 at 9. To permit such activity, the Lieutenant concluded, would create a security risk by emboldening white-supremacist inmates to spark racial unrest on the assumption that the facility and the Department of Corrections "were associated with and condoned white supremacy activity." *Id.* at 10. Lieutenant Brown also decided that Mr. Koutnik's desire to merchandize his design was also incompatible with the facility's efforts to rehabilitate him, even if the design never were reintroduced into the prison system.

**B.**

Mr. Koutnik filed the present action in which he alleged that Lieutenant Brown's seizure of the outgoing letter violated both his first amendment and substantive due process rights. Mr. Koutnik first submitted that the regulation upon which Lieutenant Brown relied, DOC § 303.20(3), is facially overbroad and that the seizure did not have a legitimate penalogical purpose. The district court dismissed the overbreadth challenge at the initial screening required by 28 U.S.C. § 1915A(a),[1] but allowed Mr. Koutnik's as-applied challenge—concerning the use of the regulation to seize his outgoing correspondence—to proceed.

Mr. Koutnik further alleged that the seizure of his letter violated his right to substantive due process. However, the district court took the view that this claim was precluded because the Supreme Court has directed that substantive due process claims be analyzed under the specific provision of the Constitution most relevant to the claim, here the First Amendment. *See Albright v. Oliver*, 510 U.S. 266, 273 (1994); *Graham v. Connor*, 490 U.S. 386, 395 (1989); *see also Conyers v. Abitz*, 416 F.3d 580, 586 (7th Cir. 2005). Consequently, this claim was dismissed in the court's initial screening order as well.

The district court later granted summary judgment in favor of the defendants, analyzing Mr. Koutnik's remaining

---

[1] Title 28, § 1915A(a) of the United States Code requires district courts to "review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity." In conducting this review, district courts must identify cognizable claims and dismiss the complaint, or any portion thereof, that fails to state a claim.

first amendment claim under the standard set out in *Procunier v. Martinez*, 416 U.S. 396 (1974). That decision authorizes censorship of outgoing correspondence if justified by a substantial penalogical interest and if the means employed are no more intrusive than necessary to achieve that goal. *See id*. at 413. The prison ostensibly had such a purpose, the court reasoned, because institutional security and inmate rehabilitation are legitimate aims. *See Pell v. Procunier*, 417 U.S. 817, 823 (1974). However, in addressing each of these purposes, the district court expressed doubt that *outgoing* mail containing a political or racial message constitutes a security risk. *See Martinez*, 416 U.S. at 416. Accordingly, it rested its grant of summary judgment on its determination that the facility had a substantial interest in rehabilitating Mr. Koutnik and that the censorship of this article of his outgoing mail was a measure that was no more intrusive than necessary to achieve that goal. Even if Mr. Koutnik's intent was solely to criticize the penal system by associating it with a swastika and the KKK, the court reasoned, Lieutenant Brown was entitled to stop the outgoing mail because it contained those references.

**II**[2]

---

[2] Mr. Koutnik initially argues that the district court erred in dismissing his substantive due process claim. In his complaint, Mr. Koutnik alleged that "his right to Free Speech, Substantive Due Process and Freedom of Expression were violated by Defendants." R.2 at 1. His complaint further alleges that the defendants' acts "violated Koutnik's first and fourteenth amendment rights," that the harms were "based on an unconstitution-

(continued...)

_____

[2] (...continued)
ally vague and overbroad prison rule" and that the regulation should be declared "unconstitutionally vague and overbroad in that . . . it is used to punish protected activity as noted in this case." *Id.* at 4.

As noted above, in evaluating the substantive due process claim, the district court was guided by the Supreme Court's admonition in *Albright v. Oliver*, 510 U.S. 266, 273 (1994): "When a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that amendment, not the more generalized notion of substantive due process must be the guide for analyzing these claims." *Id.* (internal quotation marks and citations omitted). Because the "Petitioner allege[d] specifically that the actions of the respondents violated his First Amendment rights to free speech and freedom of expression," the district court found it unnecessary to address the claims in terms of substantive due process. R.3 at 6. On appeal, Mr. Koutnik does not contest directly the district court's application of the *Albright* rule; the section of his brief dedicated to his "substantive due process" claim simply expands upon his complaint and asks that the regulation "be declared unconstitutionally vague" and that its application be enjoined. Appellant's Br. at 10.

We believe the district court employed the correct approach. Here, Mr. Koutnik is alleging that the Department of Corrections promulgated a vague and overbroad regulation that was used to punish protected activity; these allegations invoke the protections against government interference with free speech that are guaranteed by the First Amendment. Consequently, it was proper for the district court to evaluate Mr. Koutnik's claims according to a first amendment framework, *cf. Eby-Brown Co., LLC v. Wisconsin Dep't of Agric.*, 295 F.3d 749, 754 (7th Cir. 2002) (citing *Albright* and refusing to analyze complaints of unequal treatment as substantive due process claims, as opposed to equal protection

(continued...)

**A.**

On appeal, Mr. Koutnik first argues that the district court erred in dismissing his facial challenge to Wisconsin Administrative Code DOC § 303.20(3) at the screening stage. This section prohibits participating "in any activity with an inmate gang" or "possessing any gang . . . symbols"; in turn, DOC § 303.02 (11) defines "an inmate gang" as "a group of inmates which is not sanctioned by the warden." Mr. Koutnik asserts that, at the Wisconsin Secure Program Facility, there are *no* inmate groups sanctioned by the warden. Therefore, he argues that DOC § 303.20(3) prohibits the possession of symbolism which could be associated with *any* group.[3]

Mr. Koutnik misreads the provision. The operative section of the administrative code does not prohibit inmates from possessing the symbolism of *any* group, but rather any *inmate* group not approved by the warden. This distinction is significant because it makes the provision quite narrow; indeed, if strictly read, DOC § 303.20 would not authorize prison administrators to ban the symbolism of white supremacy groups if there were no inmate groups associated with that cause. With this understanding of the regulation in mind, we turn to Mr. Koutnik's legal arguments.

To launch a successful overbreadth challenge, a plaintiff must show "that a law punishes a 'substantial' amount

---

[2] (...continued)
claims), and we address Mr. Koutnik's overbreadth and vagueness claims below.

[3] We note that Mr. Koutnik forwarded identical vagueness and overbreadth arguments in a separate action; this court rejected those arguments in an unpublished order. *Koutnik v. Brown*, No. 05-4473, slip op. at 3-4 (7th Cir. July 24, 2006).

of protected free speech." *Virginia v. Hicks*, 539 U.S. 113, 118 (2003); *see also Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1056 (7th Cir. 2004). We have explained, however, that "the concepts of 'overbreadth' and 'vagueness' in the jurisprudence of the First Amendment were devised in order to prevent the slightest discouragement of free speech, and therefore have only limited relevance to a sphere where the right of free speech is limited." *Ustrak v. Fairman*, 781 F.2d 573, 580 (7th Cir. 1986). Prison inmates have limited first amendment rights, *see, e.g.*, *Turner v. Safley*, 532 U.S. 223, 228 (2001) (noting that "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large"); therefore, "[w]hatever scope overbreadth analysis has in criminal prosecutions . . . it has little or none in civil litigation dealing with prisons' internal operations," *Borzych v. Frank*, 439 F.3d 388, 391 (7th Cir. 2006). This limitation on the overbreadth doctrine grows out of the inherent restrictions on the rights of prisoners and the concomitant special need of prison administrators for flexible regulations. "Some open-ended quality is essential if a prison is to have any guidelines; it is impossible to foresee all literature that may pose a threat to safety and security." *Id*. Given the extremely limited scope of overbreadth analysis in this context, we conclude that any overbreadth in the regulation at issue here "is not 'substantial' in relation to its proper applications." *Id*. The district court correctly dismissed the overbreadth claim pursuant to § 1915A(b)(1).

We turn, then, to Mr. Koutnik's vagueness challenge.

> [E]ven if a law does not reach a substantial amount of constitutionally protected conduct, it can be found to be impermissibly vague if it fails to define the offense with sufficient definiteness that ordinary people can under-

> stand what conduct is prohibited and it fails to establish standards to permit enforcement in a nonarbitrary, nondiscriminatory manner.

*Fuller by Fuller v. Decatur Pub. Sch. Bd. of Educ. Sch. Dist. 61*, 251 F.3d 662, 666 (7th Cir. 2001). A party raising a facial challenge to a statute or regulation on vagueness grounds "must demonstrate that the law is impermissibly vague in all of its applications." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982). "The nature of the law" also affects the vagueness analysis. *Fuller*, 251 F.3d at 667. Thus, for example, school officials may have greater latitude in fashioning student disciplinary rules because of the "need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 686 (1986). Similarly, as we have noted above, "[s]ome open-ended quality is essential if a prison is to have any guidelines; it is impossible to foresee all literature that may pose a threat to safety and security." *Borzych*, 439 F.3d at 392.

In the present context, we believe a reasonable person would understand the regulation to prohibit the symbols employed here, a swastika and the letters "KKK." These symbols have been associated with racist and white suprem-acist groups for over half of a century—groups, not surprisingly, that are not recognized by the warden. Furthermore, the fact that the regulation provides some latitude to prison officials in defining gang symbols does not render it void for vagueness. Indeed, this court has upheld school regulations prohibiting "gang-like activity" against a vagueness challenge. *See Fuller*, 251 F.3d at 667-68. Given the greater flexibility accorded prison officials to ensure order and safety in a prison population, we do not believe that the

regulation fails to inform the inmate population as to what symbols are prohibited. The regulation, therefore, is not unconstitutionally vague.

### B.

Mr. Koutnik's remaining first amendment claim is that the statute is unconstitutional as applied to his activity. The district court held, and we agree, that censorship of an inmate's outgoing mail still is scrutinized under the standard espoused in *Martinez*, 416 U.S. at 413. *See Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996); *Gaines v. Lane*, 790 F.2d 1299, 1304 (7th Cir. 1986). Although *Martinez* later was overturned in part, the Supreme Court specified in doing so that the decision would remain the standard for cases involving *outgoing* mail. *See Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989). Other circuits have applied *Martinez* in that context, and so shall we. *See, e.g., Nasir v. Morgan*, 350 F.3d 366, 371 (3d Cir. 2003) (applying *Martinez* to seizures of outgoing correspondence); *California First Amendment Coalition v. Woodford*, 299 F.3d 868, 878 (9th Cir. 2002). *But see Altizer v. Deeds*, 191 F.3d 540, 548 (4th Cir. 1999) (applying a more deferential standard where outgoing mail was inspected, but not censored).[4]

---

[4] In their brief, the defendants urge that we apply the standard set forth in *Turner v. Safley*, 482 U.S. 78 (1987), "in light of the Supreme Court's indication in *Shaw v. Murphy*, 532 U.S. 223, 229 (2001), that there is a unitary standard applicable to prisoners' constitutional claims." Appellees' Br. at 16. In essence, they maintain that *Shaw* operated as a de facto overruling of *Procunier v. Martinez*, 416 U.S. 396 (1974). We decline this invitation. In *Shaw*, the Court framed the issue accordingly:

(continued...)

There are two prongs to the *Martinez* test. "First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression." *Martinez*, 416 U.S. at 413; *see also Gaines*, 790 F.2d at 1304. Such interests include "security, order, and rehabilitation." *Martinez*, 416 U.S. at 413. Second, the challenged action "must be no greater than is necessary or essential to the protection" of that interest. *Id.*

The district court identified the governmental interest at stake in this case as the rehabilitation of Mr. Koutnik and other inmates. There is no question that the rehabilitation of inmates is a legitimate interest of penal institutions. "The more difficult task however, is not in identifying an impor-

---

[4] (...continued)

> Under our decision in *Turner v. Safley* . . . restrictions on prisoners' communications *to other inmates* are constitutional if the restrictions are "reasonably related to legitimate penological interests." In this case, we are asked to decide whether prisoners possess a First Amendment right to provide legal assistance that enhances the protections otherwise available under *Turner*. . . .

532 U.S. at 225 (quoting *Turner*, 482 U.S. at 89; emphasis added). The Court, however, determined that *Turner* provided the appropriate analytical framework and "decline[d] to cloak the provision of legal assistance with any First Amendment protection above and beyond the protection normally accorded prisoners' speech." *Id.* at 231.

*Shaw*, therefore, did not address the right of prisoners to send mail outside the prison—the regulation of which is governed by the *Martinez* standard. Furthermore, as noted above, after the Court handed down *Shaw*, other courts of appeals have applied the *Martinez* standard, not the *Turner* standard, to evaluate the regulation of prisoners' outgoing mail.

tant governmental interest at stake, rather it is in determining whether the enforcement of [the rule] was no greater an infringement upon [Mr. Koutnik's] first amendment liberties than [was] necessary to protect the state's interest." *Rios v. Lane*, 812 F.2d 1032, 1037 (7th Cir. 1987). It is on this element of the *Martinez* test that Mr. Koutnik focuses his challenge to the district court's judgment. Specifically, Mr. Koutnik claims that the defendants have not established that the mail sent to Northern Sun contained gang symbols or that "the drawing [of] a swastika and referencing the Ku Klux Klan in an outgoing letter threatens a prisoner's rehabilitation." Appellant's Br. at 20. We now address each of these contentions.

With respect to whether Mr. Koutnik's mail to Northern Sun contained gang-related symbols, we believe that this is an assessment that prison staff is uniquely suited to make. Knowledge of prison gang symbols—how they are used and what they mean—is acquired primarily through interaction with, and observation of, prisoners. Additionally, gang symbolism is not static; symbols change and are added as gangs expand their bases and combine with other groups. Consequently, because the prison staff has daily contact with gang members and because the number and kind of gang symbols do not remain constant, we shall defer to the staff's assessment that Mr. Koutnik's correspondence to Northern Sun contained gang symbols. *Cf. Beard v. Banks*, 126 S. Ct. 2572, 2578 (2006) (plurality opinion) (reiterating that "courts owe 'substantial deference to the professional judgment of prison administrators'" (quoting *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003))); *Martinez*, 416 U.S. at 405 (observing that problems related to prison administration require "expertise" "peculiarly within the province of the legislative and executive branches of government").

Mr. Koutnik also maintains that his inclusion of a swastika and his veiled reference to the KKK are not related in any way to his rehabilitation. In his brief, he points to the Supreme Court's statement in *Martinez* that "the weight of professional opinion seems to be that inmate freedom to correspond with outsiders advances rather than retards the goal of rehabilitation." 416 U.S. at 412. However, the Court's statement was premised on two internal policy statements of the Federal Bureau of Prisons. The first of these stated: "Constructive, wholesome contact with the community is a valuable therapeutic tool in the overall correctional process." *Id.* at 412 n.13 (internal quotation marks and citations omitted). The second acknowledged that "[c]orrespondence with members of an inmate's family, close friends, associates and organizations is beneficial to the morale of all confined and may form the basis for good adjustment in the institution and the community." *Id.* (internal quotation marks and citations omitted). Taken in that context, we believe that the Supreme Court's statement in *Martinez* actually supports the defendants' position here. Mr. Koutnik's correspondence was not an effort to establish "constructive, wholesome contact" with the outside community that would foster successful reintegration into society, *id.*; it was an effort to appeal to groups that would hinder, rather than foster, respectful human interaction, both inside and outside of prison. Mr. Koutnik's attempts to market symbols affiliated with racially intolerant groups obviously thwarted the State's legitimate goals "to encourage the plaintiff to live crime-free when he is released from custody" and to foster "the ability to resolve conflicts without resorting to violence, and to recognize that successful reintegration into society requires respecting the rights of others." R.15 at 11. Accordingly, the confiscation of his outgoing mail in this case did "further [the] important or

substantial governmental interest" in rehabilitation. *Marti-nez*, 416 U.S. at 413.

## Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED

A true Copy:

Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*