Johnson W. GREYBUFFALO,
Plaintiff,

v.

Phil KINGSTON, in his individual and official capacities as Warden of Waupun Correctional Institution; Bruce Muraski, in his individual and official capacities; Cynthia Clough, in her individual and official capacities;[1] Correctional Officer Bret Mierzejewski, in his individual and official capacities; and William Schultz, in his individual and official capacities, Defendants.

No. 06–C–504–C.

United States District Court,
W.D. Wisconsin.

Sept. 18, 2007.

Order Amending Opinion Sept. 25, 2007.

---

1. In his complaint, plaintiff identified this defendant as "C. Clough." Defendants have identified Clough's full name in their summary judgment materials. I have amended the caption accordingly.

Johnson W. Greybuffalo, pro se.

David Hoel, David Hoel, Wisconsin Department of Justice, Madison, WI, for Defendants.

## OPINION AND ORDER

BARBARA B. CRABB, District Judge.

This case tests the limits of prison officials' ability to restrict a prisoner's right to free speech in the name of security. Put more specifically, it requires the court to consider the question how tenuous the connection between security and a restriction may be before a court must conclude that the restriction has no logical connection to the asserted interest or is an exaggerated response to that interest, making it invalid under the First Amendment.

At the center of the case are two documents confiscated from plaintiff Johnson Greybuffalo, a prisoner in the custody of the Wisconsin Department of Corrections. One document contains a 1775 quotation about freedom from a Native American chief and the initials "A.I.M.," which the parties agree stands for "American Indian Movement." The other document is a code of ethics of the Warrior's Society. Defendants confiscated both of these documents from plaintiff and placed him in segregation for 180 days as discipline for possessing them, after concluding that both documents were "gang literature" under Wis. Admin. Code § DOC 303.20(3).

Plaintiff filed this lawsuit for declaratory and injunctive relief under 42 U.S.C. § 1983, challenging defendants' confiscation of these documents and their discipline of him on the ground that both actions violated his First Amendment right to free speech. (Because the discipline plaintiff received did not affect the duration of his confinement, plaintiff correctly chose to raise his First Amendment challenge in a civil action under § 1983 rather than in a petition for a writ of habeas corpus. *DeWalt v. Carter*, 224 F.3d 607, 617 (7th Cir.2000).) The case is before the court on defendants' motion for summary judgment.

The question raised in defendants' motion is whether the censorship of plaintiff's documents was reasonably related to defendants' interest in prison security. I conclude that such a reasonable relationship exists with respect to the "Warrior's Society" document, but that defendants' censorship of the "A.I.M" document is an exaggerated response to any legitimate security concerns. These contrasting conclusions are required by the differences between the nature of the groups at issue and the nature of the information in the documents. The Warrior's Society is a prisoner group created for the purpose of enabling the "self-protection" of Native American prisoners, a purpose that is directly conducive to violent confrontations with other prisoners; the American Indian Movement is a non-prisoner civil rights organization dedicated to obtaining equality for Native Americans. Although defendants point to a few controversial actions of some members of the Movement, these actions occurred more than 30 years ago.

More important, the Warrior's Society document, which is a code of ethics, suggests allegiance to the Society and endorsement of its actions. In sharp contrast, the A.I.M. document suggests no allegiance to the group. The quotation in the document, which simply advocates fair treatment, does not come from the American Indian Movement or one of its members.

Defendants point to no record evidence supporting the reasonableness of a belief that simply writing the initials "A.I.M." on a document can in any way undermine prison security. Their bare assertion that it does is contradicted by their own prison library, which includes books containing favorable discussions of the American Indian Movement. Thus, to accept defendants' censorship of this document as consistent with the First Amendment would go far beyond giving prison officials the deference they are due; it would be an abdica-

tion of the court's obligation to review a restriction on a prisoner's First Amendment rights. Accordingly, I will grant defendants' motion for summary judgment with respect to the censorship of the Warrior's Society document, but I will deny the motion with respect to the A.I.M. document and grant summary judgment to plaintiff.

From the parties' proposed findings of fact and the record, I find the following facts to be undisputed.

## UNDISPUTED FACTS

At the time of the events relevant to this lawsuit, plaintiff Johnson Greybuffalo was a prisoner at the Waupun Correctional Institution in Waupun, Wisconsin. Plaintiff is a Native American and a member of the Sisseton–Wahpeton Oyate tribe.

### A. Plaintiff's Study of the American Indian Movement

While plaintiff has been incarcerated, he has studied Native American history. Included in the topics he studied is the American Indian Movement, which is discussed in several books in the Waupun prison library. The following description of the American Indian Movement may be found in the prison library's copy of the *World Book Encyclopedia:*

American Indian Movement (AIM) is a civil rights organization in the United States and Canada. It works for equal rights for American Indians and improvement of their living conditions....

AIM was founded in Minneapolis in 1968.... Its original goals were to help improve the lives of the city's Indians and to protect them from police actions that AIM considered brutality.... AIM has carried out several protests to call national attention to the problems of Indians. In 1972, members occupied the headquarters of the Bureau of Indian Affairs in Washington, D.C., for seven days. The following year, AIM mem-

bers and other Indians seized the village of Wounded Knee, S. Dak., where the U.S. Cavalry massacred more than 200 Sioux in 1890.

During the 1970's, AIM also established and operated a number of organizations to help Indians develop a sense of self-determination.... Since 1974, AIM has attempted to unite Native Americans throughout the Western Hemisphere.

Also included in the prison library is *Wasi'chu: The Continuing Indian Wars*, which includes the following history of the American Indian Movement:

AIM ... began in Minneapolis–St. Paul during 1968.... During its early years AIM was an urban-Indian group, which concentrated on such projects as a street patrol in Minneapolis to reduce police harassment of Indian people. AIM also assisted Indians in difficulties with the welfare bureaucracy and slumlords. During this early period AIM members studied their history and culture ... and realized that they had been indoctrinated with ideas that alienated them both from their spiritual heritage and their relationship to the land. Gradually, they returned to reservations ... AIM was invited to the Pine Ridge Reservation by the Oglala Sioux Civil Rights Organization to aid in its fight against the corrupt trial government.

The new unity of purpose was displayed in the Trail of Broken Treaties, an automobile caravan across the United States.... The caravan itself did not get much official attention, nor did the Indians. When they arrived in Washington, D.C., President Nixon ... ignored the Indian visitors. The lack of media attention ended when the group occupied the head office of the Bureau of Indian Affairs in order to get a hearing for the

twenty-point bill of particulars they had brought.

The occupation was not intended; the Indians had first approached the BIA looking for a place to stay, which would replace a rat-infested church where they were housed while seeking appointments with government officials. A group of Indians entered the BIA headquarters asking to meet with officials. Police, who had surrounded the building, panicked and called the entry an occupation, The Indians, in turn, broke off a few table legs to defend themselves. And so the "occupation" began.

. . . . The Indians' bill of grievances called for a renewal of treaty making, relief from past treaty-rights violations, a Congressional investigation into the Bureau of Indian Affairs and related components of the colonial system, abrogation of the multinationals' leases for Indian land and resources, repeal of termination acts carried out in the 1950s, repeal of Public Law 53–280, establishment of an Indian grand jury at the national level, recognition of Indian jurisdiction over non-Indians on treaty land, improved treatment of prisoners, and financial aid to get Indians started on a path toward economic self-determination.

Their demands unanswered, many of the Indians involved in the BIA occupation reassembled at Wounded Knee four months later, on the site where more than three hundred Lakota men, women and children had been massacred by the United States Army in 1890. Many of the grievances were raised again. Again, the government responded with a deaf ear and a strong arm; after the seventy-one day occupation, the physical repression of Indian resistance intensified.

. . . .

[I]nstead of addressing the fundamental causes of disorder, the response [from the government] was one of armed force. During the seventy-one day occupation, two people at Wounded Knee were killed in a government exercise in encirclement, which was later revealed to have been a test of a nationwide military plan, known as "Operation Cablesplicer," for suppressing civilian disorders.

While plaintiff was incarcerated at the Green Bay Correctional Institution in Green Bay, Wisconsin, he checked out one book from the prison's chapel called *Wocante Tinza: A History of the American Indian Movement*. That book contained a purported quotation from 1775 attributed to Chief Joseph of the Nez Perce tribe:

Let me be a free man, free to travel, free to stop, free to work, free to trade where I choose, free to choose my own teachers, free to follow the religion of my fathers, free to talk, think and act for myself and I will obey every law or submit to the penalty.

Plaintiff copied this quotation by hand on a separate sheet of paper and wrote the initials "A.I.M." at the top. The same quotation may be found in the book *War Chief Joseph*, which is included in the Waupun prison library.

### B. *Plaintiff's Involvement with the Warrior's Society*

When plaintiff was a child, he was a grass dancer and member of the Traditional Tribal Tokala Warrior's Society. This Warrior's Society was "strictly culturally based."

While plaintiff was at the Green Bay facility, he received from a prison volunteer a document titled "Warrior's Society" that includes a code of ethics:

Have respect for the sacred pipe,

And all ceremonies of our way of life
. . .

We shall serve the people "heart and soul"

To the best of our abilities . . .

We shall acquit ourselves with honor and strive to be the people's pride . . .

Do not put your own interests ahead of

those of the people . . .

Do not talk about each other . . .

Be kind to one another . . .

Do not steal from one another . . .

Don't be stingy . . .

### Responsibilities

Preserve order in the community . . .

Foster inter-society rivalry to cultivate bravery

And a military spirit among themselves and

Among the boys, who need a living example of

Their future responsibilities . . .

Minister to the desires of members for

Social recreation through feasts and dances . . .

Serve as keepers and reminders of the tribe's

Heritage and traditions . . .

Look out for the community at all times

Guarding against all possible surprises.[2]

This code of ethics is similar to other Native American codes of ethics, including one that is found in Waupun's prison library.

---

**2.** Because defendants did not file these documents in camera or ask that they be put under seal, I have included their full text.

### C. *Defendants' Discipline of Plaintiff for Possessing "Gang Literature"*

On May 25, 2005, defendant Bret Mierzejewski (a correctional officer) conducted a random search of plaintiff's cell. Mierzejewski discovered the "A.I.M" document and the "Warrior's Society" document described above. Concluding that these documents were contraband, Mierzejewski confiscated them and sent them to a "Gang Coordinator/Investigator" (defendant Bruce Muraski) for review. In addition, defendant Mierzejewski issued a conduct report to plaintiff, charging him with "Group Resistance and Petitions" under Wis. Admin. Code § DOC 303.20, "Possession of Contraband" under § DOC 303.47 and Violation of Institution Policies and Procedures under § DOC 303.63. In the conduct report, Mierzejewski noted that both the American Indian Movement and the Warrior's Society are "unsanctioned groups," that the Movement is a "race group" similar to "white supremacist[s]" or the "Black Panther" party and that the Society is a prisoner group including "violent offenders" that are involved in "criminal/drug activities."

Defendant Muraski has been monitoring gang activity at Waupun Correctional Institution since 1987. His job includes creating and implementing strategies for identifying and managing gang activity in the prison. He recognized the Warrior's Society as a prisoner group that was formed to provide protection to Native American prisoners. Its prisoner members have engaged in violence, drug dealing and other criminal activities. In his experience defendant Muraski has found that gangs in prison commonly engage in recruiting and exercise control of members by issuing lists of rules and expectations of

the kind set forth in plaintiff's "Warrior's Society" document.

Defendant Muraski viewed the American Indian Movement as a "Native American activist organization." In the early 1970's, members of the group were involved in "forceful takeovers and sometimes armed seizures of public facilities."

At the Waupun prison, prisoners are prohibited from possessing literature about a group unless that group is "specifically sanctioned" by prison administrators. Neither the American Indian Movement nor the Warrior's Society is a sanctioned group at the prison. After reviewing plaintiff's documents, Muraski concluded that the documents were contraband because they included references to unsanctioned groups.

On June 16, 2005, plaintiff received a disciplinary hearing before defendants William Schultz (a financial specialist) and Cynthia Clough (a supervising officer). The evidence before Schultz and Clough included the conduct report, plaintiff's oral and written statements, plaintiff's disciplinary history and literature offered by plaintiff. At the conclusion of the hearing, Schultz and Clough found plaintiff guilty of Wis. Admin. Code § DOC 303.20(3), which prohibits prisoners from "possess[ing] any gang literature, creed, symbols or symbolisms." In addition, Schultz found plaintiff guilty of possessing contraband (§ DOC 303.47) but not guilty of violating institution rules and procedures (§ DOC 303.63).

In their written decision, Schultz and Clough noted that defendant Muraski had concluded that the confiscated documents included references to "AIM" and the "Warrior Society," which are both "unsanctioned groups." In addition, they wrote:

AIM is recognized as a race group such as white supremacy [sic] or the Black Panther party. Warrior Society was originally formed for race/cultural preservation and safety in prisons. Over the years, the unsanctioned group became violent offenders [who] involve themselves in criminal/drug activities.

On this basis, Schultz and Clough concluded that plaintiff had possessed "gang literature and creeds;" they disciplined plaintiff with 210 days of disciplinary separation (a form of segregation).

On appeal, defendant Phil Kingston (the warden) modified the decision, concluding that it supported a finding of guilt for § DOC 303.20(3) (possession of gang literature), but not of § DOC 303.47 (possession of contraband). Kingston reduced plaintiff's discipline to 180 days of disciplinary separation.

OPINION

A. *Censorship of Reference to "A.I.M."*

Defendants disciplined plaintiff for possessing two documents. The first was a piece of paper with the initials "A.I.M" (which stands for "American Indian Movement") handwritten on the top followed by a quote attributed to an 18th century Native American chief:

Let me be a free man, free to travel, free to stop, free to work, free to trade where I choose, free to choose my own teachers, free to follow the religion of my fathers, free to talk, think and act for myself and I will obey every law or submit to the penalty.

 The parties agree that the censorship of this document implicated plaintiff's First Amendment rights. Under *Turner v. Safley,* 482 U.S. 78, 98, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), a restriction on a prisoner's right to free speech violates the First Amendment when the restriction is not "reasonably related" to legitimate penological interests but instead is an "exaggerated response" to such interests.

The Supreme Court has instructed courts to consider four factors in determining whether this test is satisfied: whether there is a "valid, rational connection" between the restriction and a legitimate governmental interest; whether the prisoner retains alternatives for exercising the right; the impact that accommodation of the right will have on prison administration; and whether there are other ways that prison officials can achieve the same goals without encroaching on the right.

■ Prison officials have the initial burden to show a logical connection between the censorship and their legitimate interest. *Beard v. Banks*, 548 U.S. 521, 126 S.Ct. 2572, 2581, 165 L.Ed.2d 697 (2006) ("*Turner* requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective."); *King v. Federal Bureau of Prisons*, 415 F.3d 634, 639 (7th Cir.2005) ("the government must present some evidence to show that the restriction is justified"). A failure to do so makes it unnecessary to consider the remaining factors because an illogical free speech restriction is always invalid. *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir.2006) ("The first *Turner* 'factor' is more properly labeled an 'element' because it is not simply a consideration to be weighed but rather an essential requirement.") (citing *Turner*, 482 U.S. at 89, 107 S.Ct. 2254, and *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 350, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)).

With respect to the first *Turner* factor, defendants do not clearly identify the legitimate interest served by censoring plaintiff's documents, beyond a general reference to "prison security" and a slightly more specific reference to "suppressing gang activity." Dfts.' Br., dkt. # 19, at 9–10. Although defendants do not say so explicitly, it is clear from the disciplinary decision itself (which found plaintiff guilty of possessing "gang literature" under Wis.

Admin. Code § DOC 303.20(3)) that defendants have classified the American Indian Movement as a "gang."

■ The importance of an interest in suppressing gang activity is obvious and needs no citation to authority, though there is a plethora of case law demonstrating the need of prison officials to suppress gangs. *E.g. Wilkinson v. Austin*, 545 U.S. 209, 227, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005); *Turner*, 482 U.S. at 91–92, 107 S.Ct. 2254; *Koutnik v. Brown*, 456 F.3d 777 (7th Cir.2006); *Fraise v. Terhune*, 283 F.3d 506 (3d Cir.2002); *Young v. Lane*, 922 F.2d 370 (7th Cir.1991); *Hadi v. Horn*, 830 F.2d 779 (7th Cir.1987); *Rios v. Lane*, 812 F.2d 1032 (7th Cir.1987). However, the word "gang" is a loaded term. Although courts are required to defer to the reasoned judgment of prison officials on gang-related matters, *Koutnik*, 456 F.3d at 785, prison officials cannot avoid scrutiny for restricting prisoners' constitutional rights simply by incanting the word "gang." "[D]eference does not imply abandonment or abdication of judicial review." *Miller–El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). Or, as plaintiff puts it a bit more colloquially, "a court should not simply swallow whatever line an official feeds it. Officials must support their policies with facts, not conjecture." Plt.'s Br., dkt. # 26, at 8 (citing *Shimer v. Washington*, 100 F.3d 506, 509–10 (7th Cir.1996) and several other cases). Thus, the question is not just whether defendants called the American Indian Movement a gang, but rather whether a reasonable relationship exists between censoring plaintiff's document and furthering an interest in prison security.

From a review of defendants' briefs, proposed findings of fact and the disciplinary record, I can discern three interrelated asserted bases for a conclusion that the American Indian Movement is a "gang"

and that any literature about it must be suppressed: (1) the group is not sanctioned by prison authorities; (2) it is a "race" group; (3) it has a "negative ... histor[y]." I will consider each of these grounds in turn.

### 1. *"Unsanctioned" group*

■ It is undisputed that prisoners at the Waupon prison are prohibited from possessing literature of an "unsanctioned group," which is any group that prison officials have not expressly approved. Defendant Mierzejewski's conduct report and defendants Schultz's and Clough's disciplinary decision each suggest that they concluded that literature about the "American Indian Movement" is "gang literature" under § DOC 303.20(3) in part because the Movement is "unsanctioned."

It is not entirely clear where defendants derive their authority for making this conclusion. Section DOC 303.02(11) of the Wisconsin Administrative Code defines "inmate gang" broadly as "a group of inmates not sanctioned by the warden," but defendants have never suggested that the American Indian Movement is an *inmate gang*. It appears that defendants are reading § DOC 303.20(3) the same way as the prisoner in *Koutnik*, 456 F.3d at 782, who argued to the court of appeals that the regulation was overbroad under the First Amendment because it prohibited the possession of materials associated with any group not approved by the warden.

In rejecting the prisoner's argument, the court explained:

> Mr. Koutnik misreads the provision. The operative section of the administrative code does not prohibit inmates from possessing the symbolism [or literature] of *any* group, but rather any *inmate* group not approved by the warden. This distinction is significant because it makes the provision quite narrow; indeed, if strictly read, DOC § 303.20 would not authorize prison administrators to ban the symbolism [or literature] of white supremacy groups if there were no inmate groups associated with that cause.

*Koutnik*, 456 F.3d at 782.

Thus, it appears that defendants disagree with the court of appeals' reading of § DOC 303.20(3). They believe that the regulation *does* ban literature "of *any* group ... not approved by the warden," *Koutnik*, 456 F.3d at 782, not just any unapproved inmate group. Although the scope of this case does not include reviewing the correctness of defendants' interpretations of DOC regulations, defendants' disagreement with the court of appeals is significant nevertheless. To the extent the court of appeals interpreted § DOC 303.20(3) narrowly to preserve its constitutionality, that does not bode well for the validity of defendants' application of the regulation in this case.

Of course, with or without an express regulation saying so, defendants have a legitimate interest in suppressing prisoners' involvement in groups that are likely to undermine prison security. And it is arguable that the risk of security problems is decreased by prohibiting any mention of a group until that group is approved by prison officials. But that alone is not enough to justify a ban on literature regarding unsanctioned groups. Prohibiting *all* group involvement would also decrease the risk of security problems, but such a broad prohibition would almost certainly be unconstitutional except in very limited circumstances.

■ A restriction that furthers a legitimate interest may still be unconstitutional if the restriction is an "exaggerated response" to that interest. *Turner*, 482 U.S. at 87, 107 S.Ct. 2254. In this case, it is an exaggerated response to any interest in security to require preapproval from pris-

1044

on officials before a prisoner may possess any literature or documents that include a reference to the group. A countless number of groups exists in the world, the vast majority of which have no implications for prison security, even though Waupun prison officials have not yet given those groups a seal of approval. At least one such group is likely to be discussed in much if not most literature possessed by prisoners (or anyone else).

Thus, to subject prisoners to discipline for possessing materials that simply *mention* an unsanctioned group is to impose a censorship regime under which almost any written materials prisoners possess could lead to disciplinary action. Such a broad restriction is not constitutionally permissible when there are "obvious, easy alternatives" available that would further the interest in security without imposing as great a burden on the free speech rights of prisoners, *Turner*, 482 U.S. at 90, 107 S.Ct. 2254, such as prohibiting literature of groups that actually undermine prison security. *Thornburgh v. Abbott*, 490 U.S. 401, 403 n. 1, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) (upholding prison policy that permitted censorship of publications "only if it is determined detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity"). *See also Shakur v. Selsky*, 391 F.3d 106, 115 (2d Cir.2004) (reversing decision dismissing case for failure to state claim, stating, "we are not sure how a complete ban on the materials of 'unauthorized organizations' is rationally related to that goal [of prison security]. The district court articulated no such relationship, and none appears to us on the face of the regulation").

■ Status as an "unsanctioned" group does not mean in and of itself that a group is unsafe; it means only that prison officials have chosen not to approve the group (or have not yet had the opportunity to do so). Giving prison officials such unbridled discretion to prohibit literature without further justification would "invite prison officials and employees to apply their own personal prejudices and opinions as standards for prisoner ... censorship" and to prohibit materials simply because they include "unwelcome criticism." *Procunier v. Martinez*, 416 U.S. 396, 415, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) (invalidating prison regulations that censored statements that "unduly complain" or "magnify grievances," express "inflammatory political, racial, religious or other views" and include matter deemed "defamatory" or "otherwise inappropriate"). Even in the prison setting, the First Amendment does not permit arbitrary restrictions on constitutional rights.

### 2. *"Race" group*

■ In censoring and disciplining plaintiff, defendants relied on their conclusion that the American Indian Movement was a "race group." Defendants do not explain how they define such a group, except that they provide as examples white supremacists and the Black Panther party. Of course, prison officials have a legitimate interest in suppressing beliefs of racial hatred, but defendants cite no evidence or even argue that the Movement promotes animosity toward non-Native Americans or holds out Native Americans as superior to other races. Rather, the facts show only that the American Indian Movement is a "racial" group to the extent it advocates for the civil rights of Native Americans. To say that prison officials could prohibit prisoners from affiliating with this type of "racial" group would allow the banning of groups such as the NAACP, the Mexican American Legal Defense and Education Fund and the Anti–Defamation League.

To the extent defendants mean to argue that any group organized on the basis of

race is a security threat, defendants have failed to show that this belief is logical. Courts have consistently held that it violates prisoners' free speech rights to ban literature about such groups, even when they *do* advocate racial purity or supremacy, if the literature does not actually promote violence. *Compare McCabe v. Arave,* 827 F.2d 634, 638 (9th Cir.1987) ("literature advocating racial purity, but not advocating violence or illegal activity as a means of achieving this goal, and not so racially inflammatory as to be reasonably likely to cause violence at the prison, cannot be constitutionally banned"); *and Aikens v. Jenkins,* 534 F.2d 751 (7th Cir. 1976) (holding unconstitutional prison regulation that prohibited publications that "seriously degrades race"); *and Nichols v. Nix,* 810 F.Supp. 1448 (S.D.Iowa 1993) (ban on books advocating racial separatism violated prisoner's First Amendment rights) *with Lindell v. Casperson,* 360 F.Supp.2d 932 (W.D.Wis.2005) (prisoner's First Amendment rights not violated by ban on books promoting use of force to obtain white supremacy and purity). If it is unreasonable to believe that literature about white supremacy groups poses a security threat, it is certainly unreasonable to believe that literature about a civil rights organization would do so.

### 3. *History of the American Indian Movement*

Defendants' last argument for censoring plaintiff's document is that the American Indian Movement has a "negative ... histor[y]." Dfts.' Br., dkt. #19, at 9. Although defendants do not explain what they mean by this in their brief, presumably they are referring to incidents that occurred in the early 1970s in which members of the Movement forcibly occupied several government buildings to protest the treatment of Native Americans. *E.g., United States v. Looking Cloud,* 419 F.3d 781, 785 (8th Cir.2005) (noting "several incidents of violence involving the American Indian Movement" including "the seventy-one day occupation of Wounded Knee"); *State v. Red Dog,* 1992 WL 92385, *3 (Del.Super.1992) (taking judicial notice of 1973 incident in which American Indian Movement members were involved in armed takeover of Wounded Knee, South Dakota).

An initial problem in relying on this rationale to justify the censorship and discipline of plaintiff is that none of the defendants relied on it at any time during the disciplinary process. Rather, the reasons cited were that the American Movement was not sanctioned and that it was a "race group." One could argue plausibly that prison officials may not rely on post hoc justifications to support a censorship decision in litigation. The inquiry the Court has made under *Turner* is what *actually* motivated the restriction, not what could have motivated it. *E.g., O'Lone v. Estate of Shabazz,* 482 U.S. 342, 350, 351, 353, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (reviewing the testimony of prison officials about the administrative concerns that motivated the challenged regulation and their reasons for rejecting other means of accommodating the burdened religious exercise); *Turner,* 482 U.S. at 98, 107 S.Ct. 2254 (refusing to accept rationale for prison restriction in part because officials had "pointed to nothing in the record suggesting that the ... regulation was viewed as" furthering that rationale). *See also Koutnik v. Berge,* No. 03–C–345–C, 2004 WL 1629548, *8 (W.D.Wis. July 19, 2004) (holding in prisoner free speech case, that "to avoid liability, [defendants] cannot argue now that plaintiff's letter could have been justifiably censored on other grounds").

In this case in particular, there is some tension in upholding a disciplinary decision on a ground that was not considered by any of the defendants in the context of

making that decision. It may well be that defendants would not censor literature of the American Indian Movement solely because of the group's history. Even now, none of the defendants in their affidavits mentions the history of the American Indian Movement as a ground for censoring its literature. Although defendant Muraski avers that members of the Movement were involved in "forceful takeovers" of government property in the 1970s, he does not aver that he considered this history during plaintiff's disciplinary process or that such history by itself would have justified the disciplinary decision. Aff. of Muraski., dkt. # 25, ¶ 25.

But even if I assume that defendants may rely on a reason they never considered before the litigation, this simply raises a second question, which is what type of events in a group's history justifies banning all literature associated with that group? Although it may be true that members of the American Indian Movement participated in unlawful activity, defendants point to no evidence that these activities were authorized by the group as a whole or even that they were consistent with the group's philosophy or mission. If the actions of a few members condemned the whole group, this would drastically limit the amount of acceptable group literature and would likely require the censorship of the literature of most mainstream religions. Karen Armstrong, *Battle for God* (2000) (discussing acts of violence committed throughout history by members of Christian, Jewish and Muslim faiths).

Further, and perhaps more important, by defendants' own assertion, all of these incidents occurred within a period of a few years, the last of which was in 1973. In the last three decades, it appears that the Movement has not been associated with any of the controversial activities of earlier days. *E.g., Poor Bear v. Nesbitt,* 300 F.Supp.2d 904, 908–09 (D.Neb.2004) ("On

June 26, 1999, plaintiff Poor Bear and other American Indian Movement leaders organized and conducted a prayer service in memory of the murdered Lakota men."). *See also* "Brief History of the American Indian Movement," *available at* http://www.aimovement.org/ggc/history.html (listing American Indian Movement's major activities since its founding; since 1975 these are limited to activities such as bringing lawsuits challenging treatment of Native Americans, making legislative proposals, establishing schools and job training centers and hosting various meetings and conferences such as "Annual Youth & Elders International Cultural Gathering").

In fact, in at least one state, the Department of Corrections has sought the assistance of the American Indian Movement to provide religious services to Native American prisoners. *Wilson v. Moore,* 270 F.Supp.2d 1328, 1334–35 (N.D.Fla.2003) (describing efforts of officials from Florida Department of Corrections and American Indian Movement working together to find leader of religious services for prisoners). Because it has been so long since the Movement was associated with the type of activity that would undermine prison security, it may no longer be reasonable to assume that possessing literature about the group poses a security threat. Defendants cite no evidence that a prisoner's affiliation with the American Indian Movement has ever caused problems in the past, at a Wisconsin prison or any other. In my own review of the case law, I uncovered no assertions by prison officials that the Movement undermined prison security.

■ Whether support for the American Indian Movement threatens prison security is another question I need not resolve because there is an even more fundamental problem with defendant's argument: nothing in the document confiscated from plaintiff suggests that he supports the inci-

dents from the 1970s or even that he supports the agenda of the American Indian Movement. The document contains only a quotation from a Native American chief and the initials "A.I.M."

Defendants did not suggest during the disciplinary proceedings that the quotation itself posed any sort of security problem and they do not make this argument now. It is difficult to see how they could. The quotation is about freedom and fair treatment, two of the most cherished principles of American government. Further, the quotation has no direct relation to the American Indian Movement. Although plaintiff acquired the quotation from a book about the Movement (a book available in at least one Wisconsin prison), the quotation is attributed to a chief from the year 1775, almost 200 years before the American Indian Movement was formed. Finally, defendants do not suggest that the quotation is a code for something more nefarious than it seems.

This means that plaintiff was disciplined for nothing more than having a piece of paper with the initials "A.I.M." on the top. In isolation, it is simply not logical to conclude that a reference to the initials of the American Indian Movement will somehow lead to gang activity or otherwise undermine prison security. The Waupun prison library itself contains multiple books that discuss the American Indian Movement, showing that prison authorities do not believe that the mere mention of the group will incite prisoners to emulate the actions of some of the group's early members.

Defendants argue in their reply brief that there is no logical inconsistency between carrying books on the American Indian Movement in the prison library and censoring plaintiff's A.I.M. documents. They say that "[a]llowing access to historical and education materials about a group" in the prison library neither "impl[ies]" prison endorsement of the group[ ]" nor does it "present the same security issue as allowing a group to set itself up as a rival organizational structure to prison authorities." Dkt. # 29, at 2–3. This argument does not help defendants for several reasons.

First, defendants grossly mischaracterize plaintiff's conduct by suggesting in their brief that his document was an attempt to "set [the American Indian Movement] up as rival organizational structure to prison authorities." Defendants disciplined plaintiff not for gang activity or participation, but for possessing gang literature. They point to no evidence now that plaintiff had taken any steps to create an American Indian Movement organization in the prison or that he has expressed a view that prisoners should follow the tenets of the Movement rather than prison rules.

Second, it is not completely accurate to say that the prison library contains only "historical and education" materials about the American Indian Movement. At least one book in the prison library, *Wasi'chu: The Continuing Indian Wars,* discusses the American Indian Movement in a very sympathetic light. (According to Wikipedia, "Wasi'chu" is a derogatory term for "white people" that means literally "takes the fat" or "greedy person." "Wasi'chu," *available at* http://en.wikipedia.org/wiki/Wasi'chu). In the book, the authors describe early members of the American Indian Movement as people who "assisted Indians in difficulties with the welfare bureaucracy and slumlords," "studied [Native American] history and culture" and "f[o]ught against corrupt tribal government." Aff. of Greybuffalo, dkt. # 28, exh. C–6, at 202. In addition, the authors are critical of the federal government's treatment of the Native Americans in the early 1970s. *Id.* at 202–03. Perhaps most im-

portant, the authors place most of the blame on the government for the standoffs the Movement had with federal officials. *Id.*

Finally, even if I accept defendants' position that the prison's books do not connote endorsement of the American Indian Movement, this helps plaintiff more than it helps defendants. If it is not reasonable to conclude that endorsement is implied by carrying a book that depicts the Movement as crusaders for justice victimized by the government, then it is certainly unreasonable to infer plaintiff's support of the group from the mere writing of the initials "A.I.M." Neither in the disciplinary record nor in their summary judgment materials do defendants make any attempt to show otherwise.

None of defendants' stated reasons for censoring the A.I.M. document is reasonably related to an interest in security. Accordingly, I will deny defendants' motion for summary judgment and on the court's own motion will grant summary judgment to plaintiff on his claim that defendants violated his right to free speech by confiscating the document and disciplining him for possessing it. Sending this claim to trial would serve no purpose. Not only is it difficult to think of any evidence that defendants could offer at trial to show the reasonableness of their belief that the A.I.M. document would threaten prison security, defendants had ample opportunity in their own motion for summary judgment to adduce evidence to support their censorship decision. They do not suggest that their evidence is incomplete in any respect.

■ This leaves the question of remedy. Plaintiff is seeking declaratory and injunctive relief, but not monetary damages. Plt.s' Cpt., dkt. # 1, at 16. In such a case, the plaintiff's right to the requested relief is determined by the court rather than a jury. *Marseilles Hydro Power,*

*LLC v. Marseilles Land and Water Co.,* 299 F.3d 643, 649 (7th Cir.2002).

■ In this case, there is no need to hold a hearing on the appropriate injunctive relief. Plaintiff has requested two injunctions relevant to this claim: (1) the return of the confiscated document; and (2) the expungement of any disciplinary findings related to the document. The first request has been mooted by defendants, who provided plaintiff with the A.I.M. document with their motion for summary judgment. Plaintiff is clearly entitled to his second request. Under 18 U.S.C. § 3626, injunctions in civil actions brought by prisoners "shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." If it violated plaintiff's First Amendment rights to discipline him for possessing the A.I.M. document, it is necessary to erase any finding of guilt related to that document in order to correct this violation.

Accordingly, I will declare that defendants violated plaintiff's constitutional right to free speech by confiscating the A.I.M. document and disciplining him for possessing it. In addition, I will order defendants to expunge from their records any finding that plaintiff's possession of this document violated prison rules.

### B. *Censorship of Warrior Society Code of Ethics*

■ The second document confiscated from plaintiff for which defendants later disciplined him was a code of conduct with the name "Warrior's Society" at the top. The differences between this document and the "A.I.M." document are stark. To begin with, the group's name alone is highly suggestive of a potential security threat. Of course, a "warrior" is someone who engages in war, the antithesis of the type of prisoner consistent with a safe and orderly environment.

If the name itself is not sufficient to justify suppression, the group's activities are. Unlike the American Indian Movement, which appears to be a civil rights organization whose members engaged in isolated illegal activities many years ago, the Warrior Society is a group that much more closely resembles the common view of a "gang." It is undisputed that the prison counterpart of the Warrior's Society was created for the "self-protection" of Native American prisoners and that the Society includes "violent offenders [who] involve themselves in criminal/drug activities." Thus, it is reasonable for defendants to conclude that affiliation with the Warrior's Society could lead to violent confrontations with officers and other prisoners and more generally undermine prison security. *Rios*, 812 F.2d at 1037 (upholding censorship of materials related to prison group "FALN," in part because "[i]t is well known that because of their avowed use of violent and illegal means in achieving their objectives, FALN members pose a heightened and serious threat to prison security"). This conclusion is borne out by the experience of other corrections departments that have officially classified the Warrior's Society as a security threat group, *e.g., Baptisto v. Ryan*, 2005 WL 2416356, *2 (D.Ariz.2005), and by courts' description of the free world version of the Society as a "paramilitary" organization involved in "numerous" violent confrontations with the police. *United States v. Miller*, 26 F.Supp.2d 415, 420 (N.D.N.Y. 1998).

Plaintiff attempts to minimize the importance of the Warrior Society's status as a prison gang by citing a number of books on Native Americans that he believes support his view that a "traditional" Warrior's Society promotes positive values. But the passages he cites do not discuss the Warrior's Society specifically, only Native American values generally, which defendants do not challenge. Aff. of Greybuffalo, dkt.

# 28, exh. D. In addition, he insists that *his* involvement with the Warrior's Society is "strictly culturally based." Aff. of Greybuffalo, dkt. # 28, at ¶¶ 17–18. Although that might very well be true, it does not extinguish defendants' legitimate interest in suppressing affiliation with a group that is a security risk. Again, plaintiff does not deny that the Warrior's Society engages in violent and other illegal activity in prison. The First Amendment does not require defendants to make case by case determinations regarding the subjective beliefs of each prisoner who is affiliated with a dangerous group. It is enough that defendants have determined reasonably that the group is dangerous.

Also, unlike the "A.I.M." document, the Warrior's Society code of ethics is a strong statement of affiliation with the group or at least an endorsement of its activities. Plaintiff downplays the significance of the code, saying that it is similar to other codes of ethics, some of which may be found in the prison library. I agree with plaintiff that many parts of the code appear to promote undeniably positive values, such as being kind to others. However, the code also includes instructions that could be viewed reasonably as encouraging behavior that could compromise safety in the prison, such as "foster inter-society rivalry to cultivate bravery and a military spirit." In any event, it was not the language of the code that led to plaintiff's discipline, but rather the code's association with a dangerous group. In addition, in the experience of defendant Muraski (who has been monitoring gang activity at the Waupun prison since 1987), ethical codes such as the one possessed by plaintiff are often used by gangs to recruit gang members and exercise control over them. It is just this kind of expertise gained from experience to which courts should defer in considering the constitutionality of prison restrictions. *Koutnik*, 456 F.3d at 785

("because the prison staff has daily contact with gang members and because the number and kind of gang symbols do not remain constant, we shall defer to the staff's assessment that Mr. Koutnik's correspondence to Northern Sun contained gang symbols").

■ Plaintiff denies that he was using the code to recruit anyone. Again, that may be true, but in any prisoner rights case challenging an official's security determination, the question is not whether defendants can show that the prisoner is currently engaging in dangerous behavior. For example, if officials learn that a prisoner is a member of the Gangster Disciples, they need not wait until that prisoner commits an act of violence before they discipline him. *Westefer v. Snyder*, 422 F.3d 570, 574 (7th Cir.2005) (membership in security threat group justifies transfer to more secure prison). Rather, the question is whether the official concluded reasonably that the prisoner's behavior could lead to security problems in the future. *Turner*, 482 U.S. at 89, 107 S.Ct. 2254 (prison officials must be able to "anticipate security problems"). For the reasons discussed above, I conclude that defendants could make such a finding with respect to plaintiff's possession of the Warrior's Society's code of ethics.

I note that defendants provided plaintiff with a copy of the Warrior's Society code of ethics in their summary judgment materials rather than filing it in camera with the court. On its face, this appears to be inconsistent with a view that mere possession of the document is a security threat. Although defendants do not attempt to explain this discrepancy, neither does plaintiff rely on it to show the unreasonableness of the censorship. Presumably, defendants' position would be that a document that may suggest affiliation by itself does not necessarily do so when it is possessed for the purpose of litigation and included with other legal materials. Alternatively, the failure to file the document in camera may have been simply an oversight by counsel for defendants. In any case, because neither party raises this issue, I need not consider what effect, if any, the production of a document in discovery may have on a court's assessment of the reasonableness of a previous decision to censor the same document. (However, the discrepancy does counsel strongly in favor of plaintiff proceeding very carefully with his future use of the document. To protect himself from additional discipline, he may wish to seek guidance from prison officials regarding the appropriate handling of the document at the close of this litigation.)

■ Because defendants have satisfied the first factor under *Turner* (that the restriction is logically connected to a legitimate interest), the remaining factors follow quickly. With respect to the second factor, plaintiff has numerous alternatives in exercising his free speech rights. The discipline at issue was related to one group only. Even if plaintiff cannot possess literature about the Warrior's Society, he is still able to read and write about a countless number of other subjects, related and unrelated to Native American culture and history. *Thornburgh*, 490 U.S. at 418, 109 S.Ct. 1874 (finding second *Turner* factor "clearly satisfied" because publication restriction permitted "a broad range of publications to be sent, received, and read").

The third and fourth factors assess the effect that allowing the speech would have on prisoners and prison staff and ask whether prison officials have an easy alternative that would permit the exercise of the right while still allowing the officials to maintain their interest in security. *Turner*, 482 U.S. at 90–91, 107 S.Ct. 2254. These factors favor defendants as well. Once it is accepted that it is logical to

conclude that a security threat is presented by literature showing affiliation with the Warrior's Society, it follows necessarily that there is no way, easy or otherwise, to permit plaintiff to possess such literature without having a potentially harmful impact on the prison. Because it is the possession itself that creates a security risk, any accommodation of a right to possess the literature can only heighten the risk.

Because each of the four *Turner* factors favors defendants, I conclude that defendants' censorship of the Warrior Society's code of ethics is reasonably related to defendants' interest in prison security. Defendants' motion for summary judgment on this claim will be granted.

## ORDER

IT IS ORDERED that

1. The motion for summary judgment filed by defendants Brett Mierzejewski, Bruce Muraski, Cynthia Clough, William Schultz and Phil Kingston is GRANTED with respect to plaintiff Johnson W. Greybuffalo's claim that defendants violated his right to free speech by censoring a document including a code of ethics of the Warrior's Society.

2. Defendants' motion is DENIED with respect to plaintiff's claim that defendants violated his right to free speech by censoring a document that included the initials "A.I.M." On the court's own motion, summary judgment is GRANTED to plaintiff on this claim.

3. It is DECLARED that defendants violated plaintiff's First Amendment right to free speech by confiscating the A.I.M. document and by disciplining him for possessing it.

4. Defendants are ordered to expunge from their records their finding that plaintiff violated prison rules by possessing the A.I.M. document.

5. Plaintiff's request for return of the documents is DENIED as moot because defendants provided the documents to plaintiff with their motion for summary judgment.

6. The clerk of court is directed to enter judgment accordingly and close this case. Entered this 18th day of September, 2007.

## OPINION AND ORDER

In an opinion and order dated September 18, 2007, I concluded that defendants had violated plaintiff's First Amendment right to free speech by confiscating a document with the initials "A.I.M." at the top and later disciplining him for possessing it. In accordance with plaintiff's request for injunctive relief and 18 U.S.C. § 3626, I ordered defendants to expunge from their records their finding that plaintiff violated prison rules by possessing the A.I.M. document. However, I did not order defendants to return the confiscated document to plaintiff because it appeared that defendants had given it to him with their summary judgment materials. (Counsel for defendants simply had attached the document to an affidavit without seeking to file the document in camera or under seal as has been the custom of the state attorney general's office in prisoner cases involving censorship. *E.g., Kaufman v. Karlen*, 06–C–205–C; *Lindell v. O'Donnell*, 05–C–04–C, 2005 WL 568068 (W.D.Wis.2005); *West v. Berge*, 05–C–37C, 2005 WL 1378908 (W.D.Wis.2005); *Walker v. Brandt*, 02–C–135–C (W.D.Wis.2002); *Lindell v. McCaughtry*, 01–C–209–C.)

As it turns out, defendants did not provide the document to plaintiff. Defendants have filed a document called "Motion to Correct Errors of Fact in Court Order of 9/18/07" in which they state that plaintiff does not yet have the "A.I.M." document. Rather than giving plaintiff the document

with their summary judgment materials, defendants allowed him to review it without keeping it while he was preparing his own filings. (Although defendants did not include this explanation in their proposed findings of fact, brief or the affidavit itself, they did include it in a cover letter sent to the clerk of court. Normally, the court does not review cover letters in the context of ruling on a motion for summary judgment.)

 I will construe defendants' motion as one to alter or amend the judgment under Fed.R.Civ.P. 59 and I will grant the motion. Because plaintiff's request for a return of the document is not moot, I will amend the September 18 order to include an injunction directing the return of the A.I.M. document to plaintiff.

### ORDER

IT IS ORDERED that defendants' motion to alter or amend the judgment (dkt.# 33) is GRANTED.

FURTHER IT IS ORDERED that the September 18, 2007 opinion and order is AMENDED to state the following:

1. The motion for summary judgment filed by defendants Brett Mierzejewski, Bruce Muraski, Cynthia Clough, William Schultz and Phil Kingston is GRANTED with respect to plaintiff Johnson W. Greybuffalo's claim that defendants violated his right to free speech by censoring a document including a code of ethics of the Warrior's Society.

2. Defendants' motion is DENIED with respect to plaintiff's claim that defendants violated his right to free speech by censoring a document that included the initials "A.I.M." On the court's own motion, summary judgment is GRANTED to plaintiff on this claim.

3. It is DECLARED that defendants violated plaintiff's First Amendment right to free speech by confiscating the A.I.M.

document and by disciplining him for possessing it.

4. Defendants are ordered to expunge from their records their finding that plaintiff violated prison rules by possessing the A.I.M. document.

5. Defendants are ordered to return the A.I.M. document to plaintiff. The clerk of court is directed to enter an amended judgment accordingly.